1998 ND 42

Ebenezer M. SINGHA, Appellant,

v.

NORTH DAKOTA STATE BOARD OF MEDICAL EXAMINERS, and Rolf Sletten, Executive Secretary and Treasurer of the North Dakota Board of Medical Examiners, Appellees

Civil No. 970264.

Supreme Court of North Dakota.

Feb. 23, 1998.

Roger R. Sundling (argued) and Alvin O. Boucher (argued), of Robert Vogel Law Office, Grand Forks, for appellant.

John M. Olson (argued), of Olson Cichy, Bismarck, for appellees.

MARING, Justice.

[¶ 1] Ebenezer M. Singha appealed a judgment affirming an order by the North Dakota State Board of Medical Examiners denying his application for a license to practice medicine in North Dakota. Thereafter, he moved this court to supplement the record under N.D.R.App.P 27. We deny the motion to supplement the record. We hold N.D.C.C. § 43–17–18(3) requires a foreign-educated applicant for a license to practice medicine to demonstrate the kinds of courses taken at a foreign educational institution, when combined with the successful completion of three years of Board-approved postgraduate training, are substantially equivalent to the kinds of courses required at a reputable medical or osteopathic college in the United States and the successful completion of one year of Board-approved postgraduate training. We also hold the procedures of the Administrative Agencies Practice Act, N.D.C.C. Ch. 28–32, apply to the Board's consideration of an application for licensure. We reverse and remand for further proceedings.

I

[¶ 2] Singha, a 1990 graduate with a "diploma in osteopathy" from the British School of Osteopathy (B.S.O.), applied to the Board in April 1995 for a license to practice medicine. As relevant to Singha's application, N.D.C.C. § 43–17–18(3) outlines certain requirements for licensure "[i]f the applicant is a graduate of a medical or osteopathic college that has not been approved by the board or accredited by an accrediting body approved by the board at the time the degree or its equivalent was conferred." The B.S.O. was not approved by the Board and was not accredited by an accrediting body approved by the Board when Singha received his diploma in osteopathy, and the essence of this case is whether Singha qualified for licensure under the educational requirements of N.D.C.C. § 43–17–18(3).

[¶ 3] While attending the B.S.O., Singha received additional clinical training at hospitals in Pennsylvania, and he self-studied pharmacology and biochemistry. In 1991, Singha was accepted in a family practice residency program at the University of North Dakota Medical School. In 1991 and 1993, the Board assisted Singha in sitting as a courtesy candidate for a Federal Licensing Examination (F.L.E.X.) administered in Ohio. Singha successfully completed the F.L.E.X. in 1993, and in September 1995, he successfully completed the three-year family practice residency program at UND.

[¶ 4] Since 1990, Singha had corresponded with the Board about the requirements for licensure in North Dakota, and the Board had never questioned his education at the

B.S.O. until May 1995, when Rolf Sletten, the Board's executive secretary and treasurer, first raised a question in a letter to Dr. William Mann, the program director for the UND family practice residency program:

In your letter you refer to this resident as "Ebenezer Singha, M.D." and as "Dr. Singha". On the other hand, the American Osteopathic Association has recently advised us that: (1) the British School of Osteopathy is not approved by the AOA; (2) the curriculum taught in British osteopathic schools differs considerably from the curriculum taught in U.S. osteopathic schools; (3) graduates of British osteopathic schools do not train in surgery or write prescriptions; (4) British educated osteopaths are considered equivalent to physical therapists or chiropractors, and; (5) graduates of British osteopathic schools are properly addressed as "Mr. (or Ms.)" and not as "Doctor".

Point No. 5 appears to be supported by correspondence from the British School of Osteopathy. We have been provided with a copy of a letter written by M.E. Large, the registrar of that school, on November 12, 1990. Mr. Large states that "At Mr. Singha's request, I am writing to confirm the grades which he was awarded during the 4–year Diploma in Osteopathy course". I note that in your letter you state that multiple faculty have looked over Dr. Singha's academic file. I am wondering if you can shed any additional light on this situation.

[¶ 5] In July 1995, Singha appeared before the Board regarding his application. The minutes of the Board's meeting reflect:

Mr. Singha was admitted to the meeting room and was questioned by each of the Board members. This questioning was focused essentially on Mr. Singha's education at the British School of Osteopathy. Dr. Kempf asked Mr. Singha if he had advised the appropriate people at UND that his training had not been approved. Mr. Singha said that he had not. Dr. Morris asked Mr. Singha whether he held a degree which entitled him to be addressed as "doctor". Mr. Singha said that he does not. Dr. Rinn asked Mr. Singha if he was eligible for an osteopathic residency in the U.S. Mr. Singha said that he is

not. Dr. Rinn asked Mr. Singha if the British School of Osteopathy teaches courses in patient care, surgery, pharmacology, and biochemistry. Mr. Singha said that it does not. Dr. Wolff asked Mr. Singha if he knows of any other graduate of the British School of Osteopathy who is practicing medicine in the United States. Mr. Singha said that he does not.

After further discussion, the Board tabled Singha's application until its November 1995 meeting and directed staff to request a formal " 'position statement' " from the A.O.A. regarding the B.S.O.; to ask the A.O.A. about alternative pathways for Singha's eligibility for licensure; to solicit a statement and any suggestions from the B.S.O.; and to ask the UND School of Medicine how Singha had been proctored and preceptored during his residency training.

[¶ 6] In November 1995, the Board again considered Singha's application. The minutes of the Board's meeting state:

Mr. Sletten pointed out that all of those [requested] items had since been made available to the Board. He also noted that William S. Mann, M.D., had requested permission to appear before the Board on Mr. Singha's behalf.

Dr. Mann was admitted to the meeting room and was heard. Dr. Mann stated, among other things, that when Mr. Singha was permitted to write the FLEX as a courtesy candidate for North Dakota, he took that authorization as an indication that he had met the requirements for licensure. Following that presentation, the various aspects of Mr. Singha's application were discussed once again. (The most recent letter from the British School of Osteopathy was particularly noted.) ... Dr. Wolff moved that the application for licensure submitted by Ebenezer Singha be denied for the reason that Mr. Singha had not graduated from a school which qualified him for licensure. Dr. Kempf seconded that motion and a roll call vote was taken. The motion passed by a vote of 7 to 3.

On November 28, 1995, the Board issued a written order denying Singha's application, because he had "not met the educational

requirements for licensure in that he does not possess a degree of doctor of medicine or doctor of osteopathy."

[¶ 7] In December 1995, Singha's counsel requested "an official letter granting Dr. Singha's request for an appeal to the Board of its November decision." The Board treated Singha's request as a petition for reconsideration under N.D.C.C. § 28–32–14 and granted him a "limited hearing" to consider additional information pertaining to his degree from the B.S.O.

[¶ 8] At a March 1996 meeting, the Board again considered Singha's application. The minutes of the Board's meeting provide:

> [Singha's counsel] made a presentation to the Board on his behalf. After this presentation, [Singha's counsel] and the members of the Board discussed Mr. Singha's application, his education and his postgraduate training and reviewed the correspondence from Thomas F. Armour, II, D.O., correspondence from the British School of Osteopathy, correspondence and communications from the American Osteopathic Association, and correspondence from the University of North Dakota Medical School and the University of North Dakota Family Practice Residency Program. The Board devoted a considerable period of time to discussing Mr. Singha's application once again.

The Board thereafter moved to reconsider Singha's application "if [he] could procure a statement from the University of North Dakota Medical School or the AOA indicating that the education he had received at the British School of Osteopathy was substantially equivalent to the education he would have received at a medical or osteopathic school in the United States."

[¶ 9] In May 1996, the Dean of the UND School of Medicine wrote the Board on Singha's behalf:

> Based on our rather extensive observation and testing of Dr. Singha in the context of the residency program and the fact that he has passed the FLEX examinations (one measure of a candidate's knowledge of the basic and clinical sciences and of cognitive abilities required by a physician assuming independent responsibility for medical care), it appears that he has acquired through the totality of his training, a back-

ground that makes him comparable to physicians who have successfully completed our medical curriculum and our family practice residency program.

[¶ 10] During a June 1996 conference call, the Board again discussed Singha's application, but refused to grant his application for licensure. In July 1996, Singha petitioned the Board for reconsideration and requested permission for Dr. Thomas Armour, an osteopathic physician who had preceptored Singha in Pennsylvania, to appear before the Board and discuss Singha's qualifications. In a previous letter to the Board, Dr. Armour indicated Singha's education was equivalent to the training received by a majority of osteopathic or medical students in the United States. The Board refused Singha's request for an appearance by Dr. Armour. At a July 1996 meeting, the Board refused to reconsider Singha's application, but requested an opinion from its attorney about the implications of its decision.

[¶ 11] In September 1996, the Board's attorney recommended granting Singha a license to practice medicine. In November 1996, the Board issued a written order denying Singha's application, because he failed to meet the educational requirements specified in N.D.C.C. § 43–17–18. The district court affirmed the Board's decision.

II

[¶ 12] Chapter 43–17, N.D.C.C., governs the licensure of physicians and surgeons, and authorizes the Board to issue licenses to practice medicine. *See* N.D.C.C. § 43–17–07.1. By definition, the Board is an administrative agency, and therefore its procedures for physician and surgeon licensure are governed by the Administrative Agencies Practice Act (A.A.P.A.). *Sletten v. Briggs,* 448 N.W.2d 607, 609 (N.D.1989), *cert. denied,* 493 U.S. 1080, 110 S.Ct. 1135, 107 L.Ed.2d 1041 (1990); *see* N.D.C.C. § 28–32–01. *Compare Bland v. Commission on Med. Competency,* 557 N.W.2d 379, 383 (N.D.1996) (A.A.P.A. does not apply to appeals of temporary license suspensions under N.D.C.C. § 43–17–32.1).

[¶ 13] Under N.D.C.C. § 28–32–19 we must affirm the Board's licensure decision unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. Provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

If the order of the agency is not affirmed by the court, it shall be modified or reversed, and the case shall be remanded to the agency for disposition in accordance with the order of the court.

[¶ 14] Our review of the factual basis for the Board's decision involves a three-step process to decide whether its findings of fact are supported by a preponderance of the evidence, its conclusions of law are supported by its findings of fact, and its decision is in accordance with the law and is supported by its conclusions of law. *Briggs*, 448 N.W.2d at 610. In applying the preponderance-of-evidence standard, we do not make independent findings of fact or substitute our judgment for that of the Board; rather, we decide only whether a reasoning mind reasonably could have decided the Board's factual conclusions were proved by the weight of the evidence from the entire record. *Id. See Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D. 1979). It is not our function to act as a super board when reviewing decisions by an administrative agency. *Skjefte v. Job Serv. N.D.*, 392 N.W.2d 815, 817 (N.D.1986). In technical matters involving agency expertise, we have acknowledged the agency decision is entitled to appreciable deference. *Montana–Dakota Util. Co. v. Public Serv. Comm'n*, 413 N.W.2d 308, 312 (N.D.1987).

III

[¶ 15] Singha contends he is entitled to licensure under the clear language of N.D.C.C. § 43–17–18(3), because he graduated from an unapproved osteopathic college, the B.S.O., with a diploma of osteopathy. Singha also asserts the legislative history of N.D.C.C. § 43–17–18(3) confirms he is entitled to licensure, because his successful completion of three years of postgraduate training in the UND family practice residency program ensures his competency. Singha argues the totality of his training and education meet the requirements of N.D.C.C. § 43–17–18(3). The Board responds Singha's diploma of osteopathy from the B.S.O. is not equivalent to graduating from an "osteopathic college," as that term is used in the United States. The Board argues N.D.C.C. § 43–17–18(3) requires an applicant to complete a medical education designed to prepare the candidate to practice medicine.

[¶ 16] The interpretation of a statute is a question of law for the court to decide. *Bland*, 557 N.W.2d at 382. In construing statutes, our duty is to ascertain the Legislature's intent. *E.g., County of Stutsman v. State Hist. Soc'y*, 371 N.W.2d 321, 325 (N.D.1985). The Legislature's intent initially must be sought from the language of the statute as a whole. *Id.* We construe words in a statute in their plain, ordinary, and commonly understood sense. *Id.* at 327. If the statutory language is clear and unambiguous, we do not disregard that language under the pretext of pursuing legislative intent, because the intent is presumed clear from the face of the statute. *Id.* at 325. If, however, the statutory language is ambiguous, or if adherence to the strict letter of the statute produces an absurd or ludicrous result, we may resort to extrinsic aids to construe the statute. *Id.*

[¶ 17] When Singha applied for licensure, N.D.C.C. § 43–17–18 said, in relevant part:

An applicant for a license to practice medicine shall present evidence satisfactory to the board of the following qualifications:

1. Possession of the degree of doctor of medicine or doctor of osteopathy from a medical school located in the United States, its possessions or territories, or

Canada, approved by the board or by an accrediting body approved by the board at the time the degree was conferred;

2. If the applicant is the graduate of a reputable medical or osteopathic college in the United States or Canada, successful completion of one year of postgraduate training approved by the board or by an accrediting body approved by the board;

3. If the applicant is a graduate of a medical or osteopathic college that has not been approved by the board or accredited by an accrediting body approved by the board at the time the degree or its equivalent was conferred, a certificate issued by the educational council for foreign medical graduates, proficiency in writing and speaking English, and the successful completion of three years of postgraduate training in a program approved by the board or by an accrediting body approved by the board. . . .

4. Successful completion of a medical licensure examination satisfactory to the board;

5. Physical, mental, and professional capability for the practice of medicine in a manner acceptable by the board; and

6. A history free of any finding by the board, any other state medical licensure board, or any court of competent jurisdiction of the commission of any act which would constitute grounds for disciplinary action under this chapter; the board, in its discretion, may modify this restriction for cause.

[¶ 18] Subsections (1) through (3) describe educational requirements for an applicant un-der different circumstances. Subsection (1) says the applicant must possess a doctor of medicine or doctor of osteopathy from a Board-approved medical·school located in the United States or Canada. Under subsection (2), if the applicant graduates from a "reputable" medical or osteopathic college in the United States or Canada, the applicant.must successfully complete one year of postgraduate training approved by the Board. As relevant to this case, subsection (3) specifies certain requirements if the applicant graduates from a medical or osteopathic college that had not been approved by the Board when the degree or its equivalent was conferred.[1]

[¶ 19] The B.S.O. is not located in the United States or Canada and the Board, or an accrediting body approved by the Board, had not approved the B.S.O. when Singha received his diploma of osteopathy. Singha's qualifications for licensure are thus measured under the requirements of subsection (3), and the crucial issue for his application is whether he received a "degree or its equivalent" from a "medical or osteopathic college" as those terms are used in the statute.[2]

[¶ 20] Simply because a foreign educational institution is called an "osteopathic" or a "medical" school does not mean the education received at the institution satisfies the requirements for licensure in North Dakota. Under our physician licensing statutes, the Board is vested with the authority and the responsibility to protect the public from inadequately trained physicians. *See* N.D.A.C. § 50–01–01–01(1). *Cf. Bland,* 557 N.W.2d at 385 (recognizing protection of public in ex parte proceeding for temporary suspension of physician's license under N.D.C.C. § 43–17–32.1); *Soentgen v. Quain & Ram-*

---

1. Section 43–17–18, N.D.C.C., was amended by 1997 N.D. Sess. Laws, ch. 372, § 2, and now says:

   3. Graduates of international schools.
      a. An applicant who is a graduate of a medical school not located in the United States, its possessions, territories, or Canada, shall present evidence, satisfactory to the board, that the applicant possesses the degree of doctor of medicine or a board-approved equivalent based on satisfactory completion of educational programs acceptable to the board. Graduates of osteopathic schools located outside the United States are not eligible for licensure.

2. The parties do not dispute the remaining requirements of the first sentence of N.D.C.C. § 43–17–18(3)—a certificate issued by the educational council for foreign medical graduates, proficiency in writing and speaking English, and successful completion of three years of postgraduate training in a program approved by the Board or by an accredited body approved by the Board—do not preclude Singha's licensure.

*stad Clinic, P.C.,* 467 N.W.2d 73, 79 (N.D. 1991) (in defamation action, recognizing necessity for free exchange of information during investigation of physician competency). In furthering those objectives, the Board necessarily has discretion to assess the substantive merits of an applicant's qualifications to practice medicine. We reject any interpretation of N.D.C.C. § 43–17–18(3) which requires carte blanche approval by the Board of any foreign educational institution which uses a form of the word osteopath in its title, or offers some level of osteopathic education. That interpretation would lead to an absurd and ludicrous result not intended by the Legislature. We, therefore, consider extrinsic evidence of legislative intent to aid in the construction of N.D.C.C. § 43–17–18.

[¶ 21] The legislative history of N.D.C.C. § 43–17–18 recognizes the Board's concern with effectively evaluating the quality of more than one thousand medical schools throughout the world and that the legislature enacted the requirement for successful completion of a three-year postgraduate program in 1985 to reasonably ensure the competency of foreign graduates. *See* February 21, 1985 Testimony of R.W. Wheeler before Senate Social Services and Veterans Affairs Committee regarding H.B. 1284. *See also* February 10, 1987 Written Testimony of R.W. Wheeler before House Judiciary Committee regarding H.B. 1563; February 13, 1991 Letter from Rolf Sletten to House Human Services and Veterans Affairs Committee regarding H.B. 1483; February 2, 1993 Letter from Rolf Sletten to Senate Human Services Committee regarding S.B. 2477.

██ [¶ 22] Construing N.D.C.C. § 43–17–18(3) to permit completion of three years postgraduate training as the threshold for ensuring competency of foreign-educated applicants, however, would effectively delegate to another entity the Board's obligation to assess an applicant's threshold qualifications for licensure. We decline to construe N.D.C.C. § 43–17–18(3) to effectively permit an entity other than the Board to decide an applicant's qualifications for licensure. We recognize the difficulties in qualitatively comparing courses offered in foreign schools to courses offered in schools in the United States. We believe the language of N.D.C.C. § 43–17–18, when construed as a whole, establishes a minimum educational threshold that can be evaluated by assessing the kinds of courses taken at a foreign institution against the kinds of courses required by reputable osteopathic colleges in the United States. We construe N.D.C.C. § 43–17–18(3) to require an applicant to demonstrate the kinds of courses taken at a foreign institution, when combined with the successful completion of three years of Board-approved postgraduate training, are substantially equivalent to the kinds of courses required at a reputable medical or osteopathic college in the United States and the successful completion of one year of Board-approved postgraduate training.

██ [¶ 23] The Board issued a one-sentence decision denying Singha's application because he failed to meet the educational requirements of N.D.C.C. § 43–17–18. Section 28–32–13, N.D.C.C., generally requires an agency to issue concise and explicit findings of fact and separate conclusions of law which adequately explain the basis of the agency's decision. *See, e.g., Evans v. Backes,* 437 N.W.2d 848, 850–51 (N.D.1989) (agency required to explicitly state findings of fact and conclusions of law to facilitate meaningful appellate review). The Board's conclusory decision does not adequately explain the Board's rationale for denying licensure under N.D.C.C. § 43–17–18(3). Moreover, Singha has raised additional issues about the Board's procedure for deciding licensure, and those issues require further explanation of the applicability of the Administrative Agencies Practice Act (A.A.P.A.) to the Board.

IV

██ [¶ 24] The Board is an administrative agency and its procedures generally are governed by the A.A.P.A. *Briggs,* 448 N.W.2d at 609. *Compare Bland,* 557 N.W.2d at 383 (A.A.P.A. does not apply to appeals of temporary license suspensions under N.D.C.C. § 43–17–32.1). The Board must hold at least three meetings each calendar year for the examination of applicants for licensure, N.D.C.C. § 43–17–07, and must keep a record of all of its proceedings and applications for licensure. N.D.C.C. § 43–17–11.

[¶ 25] During the pendency of Singha's application, the A.A.P.A. outlined procedural requirements for agencies in a "contested case," [3] which was defined as a "proceeding, including but not restricted to ratemaking and licensing, in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing." *See* N.D.C.C. § 28–32–01(4) (1993 and 1995 pocket supplement). *See also Walton v. North Dakota Dep't of Human Servs.*, 552 N.W.2d 336, 338–39 (N.D.1996) (discussing "contested case").

[¶ 26] An agency generally may dispose of any contested case by an informal disposition that does not substantially prejudice the rights of any party. N.D.C.C. § 28–32–05.1. *See Steele v. North Dakota Workmen's Comp. Bur.*, 273 N.W.2d 692, 700–01 (N.D. 1978). In *Steele,* the Bureau informally denied a claim for benefits without an evidentiary hearing and denied the claimant's petition for rehearing. We held a formal hearing was required under the A.A.P.A. whenever an agency acts in a quasi-judicial capacity unless the parties agree otherwise or there is no dispute of material fact. *Steele,* 273 N.W.2d at 701. The rationale of *Steele* is equally applicable to the Board's licensing function.

[¶ 27] The A.A.P.A. is flexible enough to allow the Board to informally deny license applications during its scheduled meetings as long as applicants are afforded subsequent procedural safeguards required by the A.A.P.A. The statutory scheme of the A.A.P.A. generally contemplates formal hearing procedures for deciding matters before an agency. *See* N.D.C.C. §§ 28–32–06 (Evidence to be considered by agency); 28–32–07 (Consideration of information not presented at a formal hearing); 28–32–08 (Investigations—Hearings); 28–32–08.1 (Hearing officer); 28–32–08.3 (Pre-hearing conference); 28–32–09 (Subpoenas); 28–32–11 (Administration of oaths); 28–32–11.1 (Procedure at hearing); 28–32–12 (Agency to make record); 28–32–13 (Findings of Fact, Conclusions of Law, and Order of agency); 28–32–14 (Peti-

tion for reconsideration); 28–32–15 (Appeal from determination of agency); 28–32–17 (Agency to maintain and certify record on appeal).

[¶ 28] Under N.D.C.C. § 54–57–03(1), with exceptions not relevant here, all hearings of administrative agencies under N.D.C.C. Ch. 28–32 must be conducted by the office of administrative hearings in accordance with the administrative hearings provisions of Chapter 28–32. *See Blanchard v. North Dakota Workers Comp. Bur.*, 1997 ND 118, ¶ 13, 565 N.W.2d 485. Section 28–32–05(2), N.D.C.C., describes procedural rules for all administrative agencies and "[a]t any contested case hearing" affords an applicant the opportunity to present evidence and cross-examine witnesses as permitted under N.D.C.C. §§ 28–32–06 and 28–32–11.1. Under N.D.C.C. § 28–32–06(3), all testimony must be under oath or affirmation. Section 28–32–11.1, N.D.C.C., describes the procedure at the hearing. In administrative contexts, we have held a hearing generally contemplates the presentation of evidence and testimony. *Gale v. North Dakota Bd. of Podiatric Medicine,* 1997 ND 83, ¶ 20, 562 N.W.2d 878.

[¶ 29] The Board is not exempt from the foregoing procedural requirements of the A.A.P.A. The Board's reliance on *Pic v. City of Grafton,* 460 N.W.2d 706 (N.D.1990), to support the procedures and record in this case is misplaced. *Pic,* 460 N.W.2d at 709–10, did not involve an administrative agency governed by the A.A.P.A.; rather, it involved an appeal from a City Council decision in which we recognized the record of proceedings before a local governing body " 'is often inadequate or non-existent' " and "may be reconstructed through testimony and exhibits in the district court." *See* N.D.C.C. § 28–34–01 (Appeals from local governing bodies—Procedures). The A.A.P.A. requires more than the procedures used by a local governing body.

[¶ 30] Here, after meetings in July and November 1995, the Board initially denied Singha's application in November 1995. In

---

3. In 1997, the Legislature changed the terminology from "contested case" to "adjudicative proceeding." *See* 1997 N.D. Sess. Laws Ch. 277, § 2 and Prepared Testimony of Allen Hoberg on

H.B. 1158. As relevant to the issues in this case, adjudicative proceeding does not significantly differ from contested case.

December 1995, Singha requested "an official letter granting [his] request for an appeal to the Board." The Board treated Singha's request as a petition for reconsideration under N.D.C.C. § 28–32–14 and granted him a "limited hearing" to consider additional information. At the Board's March and June 1996 meetings, the Board again considered Singha's application without complying with the procedural formalities required by the A.A.P.A. and refused to grant his application for licensure. In July 1996, Singha petitioned for reconsideration. At a July 1996 meeting, the Board refused to reconsider Singha's application, and in November 1996, the Board issued a written order denying his application.

[¶ 31] Although the record on this appeal is voluminous, the Board concedes there is no verbatim transcript of Board proceedings. *See* N.D.C.C. § 28–32–12. Rather, the record of the Board's meetings include short recitations of what transpired without any indication whether the testimony of any of the witnesses was under oath or affirmation, or was subject to cross-examination. N.D.C.C. § 28–32–06(3). There is no indication Singha was afforded a formal hearing with an opportunity to present evidence. The Board's decision is a short statement Singha "does not meet the requirements for licensure in that he has not met the education requirements specified in Sec. 43–17–18, NDCC." There are no other findings or conclusions by the Board as required by N.D.C.C. § 28–32–13. *See Evans*, 437 N.W.2d at 850–51 (agency required to explicitly state findings of fact and conclusions of law to facilitate meaningful appellate review).

[¶ 32] We conclude the Board failed to comply with the procedural requirements of the A.A.P.A. in deciding Singha's application for licensure under N.D.C.C. § 43–17–18(3). There is conflicting evidence about Singha's qualifications for licensure, which should have been resolved in the context of the procedures required by the A.A.P.A. A determination under N.D.C.C. § 43–17–18(3) involves disputed issues uniquely within the realm of the Board's expertise, and we decline Singha's request to effectively act as a super board and order his licensure. We reverse the district court judgment, with instructions the court remand the case to the Board for proceedings consistent with the requirements of the A.A.P.A. and our interpretation of N.D.C.C. § 43–17–18.

## V

[¶ 33] Relying on communications between the Board and him since 1990, Singha argues the Board is estopped from denying him a license because the Board had a duty to properly advise him about the requirements for licensure and led him to believe he would be granted a license after completing the three-year residency program.

[¶ 34] Estoppel against an administrative agency is not freely applied. *Blocker Drilling Canada, Ltd. v. Conrad*, 354 N.W.2d 912, 920 (N.D.1984). The Board lacks authority to license Singha if he does not possess the qualifications required by statute. *Cf. Muscatell v. North Dakota Real Estate Comm'n*, 546 N.W.2d 374, 378–79 (N.D.1996) (Real Estate Commission lacked authority to violate public policy by agreeing to refrain from disciplinary proceedings against agent). Assuming estoppel can apply to physician licensure, this record shows communications between the Board, Singha, and others in which the Board and others incorrectly referred to Singha as a "Dr." and a "M.D." without clarification by Singha. Singha's failure to clarify those references to his status leaves him in a poor position to argue estoppel against the Board. Under these circumstances, we reject Singha's claim the Board is estopped from denying his application for licensure.

## VI

[¶ 35] Singha argues he is entitled to attorney fees under N.D.C.C. § 28–32–21.1 because the Board denied his application for licensure without substantial justification.

[¶ 36] Section 28–32–21.1, N.D.C.C., authorizes attorney fees "[i]n any civil judicial proceeding" for "judicial review of a final agency order," if the court finds in favor of the nonagency party and, in the case of a final agency order, determines the agency acted without substantial justification. *See Medcenter One, Inc. v. North Dakota Bd. of*

*Pharm.,* 1997 ND 54, ¶ 26, 561 N.W.2d 634; *Walton,* 552 N.W.2d at 341–42.

[¶ 37] A party must meet a two-part test for attorney fees under N.D.C.C. § 28–32–21.1:(1) the non-administrative agency must prevail, and (2) the agency must have acted without substantial justification. *Lamplighter Lounge, Inc. v. State,* 523 N.W.2d 73, 75 (N.D.1994). In *Aggie Investments GP v. Public Serv. Comm'n,* 470 N.W.2d 805, 814 (N.D.1991) citing *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988), we defined "substantially justified" to mean " ' "justified in substance or in the main"—that is, justified to a degree that could satisfy a reasonable person.' . . . 'A position can be justified even though it is not correct, and we believe it can be substantially (*i.e.,* for the most part) justified if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact.' " *See also Lamplighter,* 523 N.W.2d at 75.

[¶ 38] Here, Singha did not prevail in the district court, but he has prevailed on appeal to this court. The Board is clearly an administrative agency governed by the procedures of the A.A.P.A., yet inexplicably the Board did not comply with those procedures. We have sustained attorney fee awards under N.D.C.C. § 28–32–21.1 for analogous procedural miscues. *See Walton,* 552 N.W.2d at 341–42; *Aggie,* 470 N.W.2d at 814. We hold, as a matter of law, the Board acted without substantial justification in failing to follow the procedural requirements of the A.A.P.A. We direct the district court on remand to determine Singha's attorney fees for the civil judicial proceedings related to judicial review of the Board's decision.

## VII

[¶ 39] We reverse the judgment and remand to the district court with instructions to decide Singha's attorney fees and to remand to the Board for proceedings consistent with this opinion.

[¶ 40] VANDE WALLE, C.J., NEUMANN and MESCHKE, JJ., and GERALD G. GLASER, Surrogate Judge, concur.

[¶ 41] GERALD G. GLASER, Surrogate Judge, sitting in place of SANDSTROM, J., disqualified.

