# IN THE SUPREME COURT

# STATE OF NORTH DAKOTA

2018 ND 274

Michael Berg,                                          Appellee and Cross-Appellant

      v.

North Dakota State Board of Registration
for Professional Engineers and Land Surveyors,      Appellant and Cross-Appellee

No. 20170413

Apex Engineering Group, Inc.,                              Appellee

      v.

North Dakota State Board of Registration
for Professional Engineers and Land Surveyors,            Appellant

No. 20170414

Scott Olson,                                              Appellee

      v.

North Dakota State Board of Registration
for Professional Engineers and Land Surveyors,            Appellant

No. 20170415

Dain L. Miller,                                    Appellee and Cross-Appellant

     v.

North Dakota State Board of Registration
for Professional Engineers and Land Surveyors,    Appellant and Cross-Appellee

---

No. 20170416

---

Thomas Welle,                                      Appellee and Cross-Appellant

     v.

North Dakota State Board of Registration
for Professional Engineers and Land Surveyors,    Appellants and Cross-Appellees

---

No. 20170417

---

Timothy Paustian,                                  Appellee

     v.

North Dakota State Board of Registration
for Professional Engineers and Land Surveyors,    Appellant

---

No. 20170418

---

Appeals from the District Court of Burleigh County, South Central Judicial District, the Honorable David E. Reich, Judge.

AFFIRMED IN PART AND REVERSED IN PART.

Opinion of the Court by Jensen, Justice.

2

Lyle W. Kirmis (argued), Bismarck, ND, for appellants and cross-appellees.

Robert G. Hoy (argued) and Andrew D. Cook (on brief), West Fargo, ND, for appellee and cross-appellant Michael Berg.

Michael J. Geiermann (argued), Bismarck, ND, for appellee Apex Engineering Group, Inc. and appellee Scott Olson.

Kasey D. McNary (argued) and Ronald H. McLean (appeared), Fargo, ND, for appellee and cross-appellant Dain L. Miller and appellee Timothy Paustian.

Ronald H. McLean (argued) and Kasey D. McNary (appeared), Fargo, ND, for appellee and cross-appellant Thomas Welle.

**Jensen, Justice.**

[¶1]    The North Dakota State Board of Registration for Professional Engineers and Land Surveyors ("Board") appeals from district court judgments affirming in part, reversing in part, and remanding to the Board its disciplinary decisions against Michael Berg, Apex Engineering Group, Inc., Scott Olson, Dain Miller, Thomas Welle, and Timothy Paustian.  We conclude a preponderance of the evidence supports the Board's disciplinary decisions.  We affirm in part and reverse in part.


I

[¶2]    Berg, Olson, Miller, Welle and Paustian ("Respondents") are former employees of Ulteig Engineers, Inc.  Olson was terminated from Ulteig in 2009.  On November 2, 2010, Berg, Miller, Welle, and Paustian resigned from Ulteig and, along with Olson, started a competing business, Apex.

[¶3]    In the months before leaving Ulteig, the Respondents engaged in the formation of Apex and their discussions included acknowledging that Apex would be competing with Ulteig.  Olson sent emails suggesting Apex might be taking over some of Ulteig's work because Ulteig would not be able to complete the work after the Respondents left.  The emails also mentioned how the Respondents were required to keep Ulteig's best interests in mind while employed by Ulteig.  The final version of the Apex business plan stated "[i]t is also our intention to offer to complete current contracts that Ulteig holds but will not be able to complete now that key individuals are no longer with the company."

[¶4]    Following the Respondents' departure from Ulteig, Ulteig sued Apex and filed an ethics complaint with the Board, alleging Berg, Olson, Miller, Welle and Paustian violated the Professional Engineers' Code of Ethics by disclosing Ulteig's confidential information and failing to disclose a potential conflict of interest by not

1

informing Ulteig of their decision to form Apex. Ulteig also alleged the Respondents knowingly participated in a plan to seek employment for Apex on projects that Ulteig had been contracted to perform before the Respondents' departure from Ulteig.

[¶5] Following a December 2014 hearing, the Board found that each of the Respondents had violated one or more of the provisions of the code of ethics. The Board found Miller, Welle, and Paustian had improperly disclosed Ulteig's confidential information. The Board found Welle disclosed to Olson Ulteig's confidential salary information and a 2008 Ulteig business plan. The Board also found Welle had an adverse interest relating to a water/wastewater services contract from the city of Fargo while employed by Ulteig, and after leaving Ulteig, represented Apex in the same project. The Board found Miller disclosed to Olson Ulteig's confidential information relating to its transportation sector. The Board found Paustian downloaded the contents of his Ulteig laptop hard drive onto an external hard drive before leaving Ulteig and accessed the external hard drive from his Apex laptop.

[¶6] The Board found Welle, Berg, and Miller failed to disclose a potential conflict of interest. The Board found their judgment or quality of services could have been influenced because they failed to disclose their participation in the planning and formation of Apex.

[¶7] The Board also found Berg, Olson, and Welle knowingly participated in a plan to seek employment for Apex on projects Ulteig had been contracted to perform prior to their departure from Ulteig. The Board's order discussed a Ulteig contract in Jamestown that Apex knew about and became involved in after Apex was formed. The Board suspended Berg, Olson, and Miller from the practice of engineering for 60 days and suspended Welle for six months. The Board issued Paustian and Apex letters of reprimand.

[¶8] The Respondents appealed the Board's disciplinary decisions to the district court. The court affirmed the Board's decision that Welle, Berg, and Miller failed to

disclose a potential conflict of interest. The court reversed the determination that Miller, Welle, and Paustian had improperly disclosed confidential information. The court also reversed the decision that Berg, Olson, and Welle knowingly participated in a plan to seek employment for Apex on projects Ulteig had been contracted to perform before their departure from Ulteig. The court remanded to the Board for reconsideration the discipline imposed on Berg, Olson, Miller, Welle, and Paustian in light of the court's reversal of the disciplinary decisions. The court also awarded attorney fees to Berg, Welle, Apex, Olson, Miller, and Paustian.

[¶9]     On appeal to this Court, the Board argues the district court wrongfully reversed the Board's disciplinary decisions because the decisions were supported by a preponderance of the evidence. The Board also argues the district court erroneously awarded attorney fees to the Respondents. On cross-appeal, Berg, Miller, and Welle argue they did not have a conflict of interest after deciding to form Apex.


II

[¶10] Chapter 43-19.1, N.D.C.C., governs the licensing of engineers and land surveyors, and authorizes the Board to regulate the practice of engineering and surveying, including the adoption of a code of ethics. *See* N.D.C.C. §§ 43-19.1-01 and 08. The Board is "an administrative agency within the purview of chapter 28-32," the Administrative Agencies Practice Act. N.D.C.C. § 43-19.1-01.

[¶11] Under N.D.C.C. § 28-32-46, we must affirm the Board's disciplinary decision unless:

> 1.    The order is not in accordance with the law.
> 2.    The order is in violation of the constitutional rights of the appellant.
> 3.    The provisions of this chapter have not been complied with in the proceedings before the agency.
> 4.    The rules or procedure of the agency have not afforded the appellant a fair hearing.
> 5.    The findings of fact made by the agency are not supported by a preponderance of the evidence.

3

6.    The conclusions of law and order of the agency are not supported by its findings of fact.

7.    The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8.    The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

[¶12]   Under N.D.C.C. § 28-32-49, we review an administrative appeal from a district court judgment in the same manner as the district court reviews the agency's decision under N.D.C.C. § 28-32-46. *Crawford v. Dir., N.D. Dep't of Transp.*, 2017 ND 103, ¶ 3, 893 N.W.2d 770.  This Court has also noted the following with regard to our review of an agency decision:

> In reviewing an agency's findings of fact, we do not make independent findings of fact or substitute our judgment for that of the agency; rather, we determine only whether a reasoning mind reasonably could have concluded the agency's findings were supported by the weight of the evidence from the entire record. *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D. 1979).  We defer to the agency's opportunity to judge witnesses' credibility. *Koehly [v. Levi]*, 2016 ND 202, ¶ 16, 886 N.W.2d 689.  Once the facts are established, their significance presents a question of law, which we review de novo. *Bell v. N.D. Dep't of Transp.*, 2012 ND 102, ¶ 20, 816 N.W.2d 786.

*Crawford*, at ¶ 4.

[¶13]   In reviewing the factual basis of an administrative agency decision, this Court asks three questions:  (1) are the findings of fact are supported by a preponderance of the evidence; (2) are the conclusions of law supported by the findings of fact; and (3) is the decision in accordance with the law and supported by the conclusions of law? *Sletten v. Briggs*, 448 N.W.2d 607, 610 (N.D. 1989).   "In applying the preponderance-of-evidence standard, we do not make independent findings of fact or substitute our judgment for that of the Board; rather, we decide only whether a reasoning mind reasonably could have decided the Board's factual conclusions were proved by the weight of the evidence from the entire record." *Singha v. N.D. State Bd. of Med. Exam'rs*, 1998 ND 42, ¶ 14, 574 N.W.2d 838 (citing *Briggs*, at 610).  Our

4

role in reviewing the Board's decision is not to act as a "super board." *Skjefte v. Job Serv. N.D.*, 392 N.W.2d 815, 817 (N.D. 1986). The agency decision is entitled to appreciable deference in technical matters involving agency expertise. *Singha*, at ¶ 14.

III

[¶14] The Board found Miller, Welle, and Paustian violated N.D. Admin. Code § 28-03.1-01-09, relating to disclosure of confidential information:

> Registrants shall not disclose confidential information concerning the business affairs or technical processes of any present or former client or employer without the client's or employer's consent.
>
> . . . .
>
> 2. Without the consent of all interested parties, registrants shall not participate in or represent an adversary interest in connection with a specific project or proceeding in which the registrant has gained particular specialized knowledge on behalf of a former client or employer.

[¶15] The Ulteig employee handbook defines "confidential information" as:

> Confidential information includes but is not limited to: Information about Ulteig or its customers, clients, suppliers, vendors, or affiliates; information regarding Ulteig's marketing, sales, client development, pricing, and financial strategies; research, services, markets, software, inventions, formulas, technology, designs, drawings, and trade secrets, and any other information deemed confidential by Ulteig.
>
> Upon termination, all employees must immediately surrender and return to Ulteig, all confidential information, business data, and intellectual property (including copies) that is in their possession.

[¶16] The former Ulteig employees had signed an Acknowledgment of Information Technology Policy with Ulteig that provided in part:

> ii.     I understand and agree that any computers, software, and storage media provided to me by the company contains proprietary and confidential information about Ulteig Engineers, INC and its

5

customers or its vendors, and that this is and remains the property of the company at all times;

iii.    I agree that I shall not copy, duplicate (except for backup purposes as part of my job here at Ulteig Engineers, INC), otherwise disclose, or allow anyone else to copy or duplicate any of this information or software;

iv.    I agree that, if I leave Ulteig Engineers, INC for any reason, I shall immediately return to the company the original and copies of any and all software, computer materials, or computer equipment that I may have received from the company that is either in my possession or otherwise directly or indirectly under my control.

## A

[¶17] Before joining Apex, Welle was a Ulteig vice president, ran Ulteig's water/wastewater sector, and served on Ulteig's board of directors. The Board found Welle violated N.D. Admin. Code § 28-03.1-01-09 by disclosing to Olson Ulteig's confidential information regarding its business affairs or technical processes. The Board found Welle disclosed a 2008 business plan, salary information, financial information, and information regarding Ulteig's ongoing business contracts.

[¶18] The Board compared Apex's initial business plan to a 2008 Ulteig Water/Wastewater Services Business Plan and determined the Ulteig business plan was used as a template for preparing the initial Apex business plan. The two plans contain nearly identical advertising slogans and other statements. Although not formed until November 2010, the initial Apex plan discussed goals for 2008 that were nearly identical to Ulteig's goals for 2008. Welle testified that Ulteig would consider its 2008 plan a confidential document.

[¶19] The Board found that Welle disclosed the 2008 Ulteig business plan. The evidence presented at the hearing included an email from Olson dated August 22, 2010, stating "I've incorporated [Welle's Water/Wastewater] Business Plan into the overall Company Business Plan." Olson testified he had a flash drive containing the

6

Ulteig business plan, but he did not access the information during the formation of Apex.

[¶20] The Board found Welle disclosed Ulteig's salary information. Welle prepared a spreadsheet listing the partners, associates, and employees that Welle anticipated would be leaving Ulteig and joining Apex. The spreadsheet includes the listed individuals' current salary with Ulteig and their proposed salary with Apex. It also includes their 2009 hourly rate, their utilization rate, and other specific information. Another document titled "2010 Hourly Rate Schedule" includes the 2010 hourly rates for various classifications of Ulteig employees, including principals, senior engineers, land engineers, design engineers, analysts, planners, staff support, and clerical.

[¶21] The Board also found Welle violated N.D. Admin. Code § 28-03.1-01-09(2) because of his involvement in the Fargo request for proposal (RFP) for a water/wastewater services consulting agreement. Welle's notes from an October 17, 2010 meeting of the Apex principals provided that "[p]roposal preparation for Fargo W and WW services is underway." At the time of the meeting, Welle was still employed by Ulteig and Ulteig held a portion of the wastewater services consulting contract with Fargo. After its formation, Apex submitted a proposal for the contract and replaced Ulteig on the wastewater contract.

[¶22] The Board determined Welle had knowledge of the upcoming Fargo RFP while employed by Ulteig and subsequently worked on the same project for Apex:

> The Board finds that Welle, without the consent of all interested persons (which included Ulteig) participated in or represented an adversary interest in connection with a specific project or proceeding in which Welle had gained particular specialized knowledge on behalf of a former employer, Ulteig, which was in violation of NDAC § 28-03.1-01-09 Subd. 2. The Board finds that such violation occurred because Welle had an adverse interest in connection with the RFP from the city of Fargo regarding Water/Wastewater services while he was still employed by Ulteig, and then, after leaving Ulteig, proceeded to represent Apex in this same project or proceeding.

7

[¶23] A representative from Fargo with knowledge of the RFP testified other engineering firms knew of it before it was published. He also testified the consulting services agreement is not a specific project. Although that testimony conflicts with the Board's findings, we give deference to the Board in its determination that Welle's knowledge and information regarding the consulting services agreement was "in connection with a specific project or proceeding in which the registrant has gained particular specialized knowledge." N.D. Admin. Code § 28-03.1-01-09(2); *see Landrum v. Workforce Safety and Ins. Fund*, 2011 ND 108, ¶ 20, 798 N.W.2d 669 (stating this Court "does not substitute its judgment for that of the agency"). The agency resolves conflicts of evidence and weighs the credibility of witnesses. *Id.*

[¶24] After a review of the record, we conclude the Board's decision that Welle violated N.D. Admin. Code § 28-03.1-01-09 is supported by a preponderance of the evidence; a reasoning mind reasonably could have decided the Board's factual conclusions were proven by the weight of the evidence from the entire record. We reverse that part of the district court judgment relating to Welle's violations of N.D. Admin. Code § 28-03.1-01-09 and N.D. Admin. Code § 28-03.1-01-09(2).

B

[¶25] The Board found Miller violated N.D. Admin. Code § 28-03.1-01-09 by disclosing to Olson Ulteig's confidential information relating to its transportation sector. Before leaving Ulteig on November 2, 2010, Miller was the vice president of Ulteig's transportation sector.

[¶26] In the same August 22, 2010 email from Olson discussing Welle's water/wastewater business plan, Olson requested Miller contribute to the Apex business plan: "[Miller], if you could adopt a similar format as was used by the Water Group, that would make the entire plan look more consistent." On September 3, 2010, Olson emailed a revised Apex business plan with Miller's transportation

8

information included. Olson's email included a statement from an attorney about "being sued for using marketing plans or data that relates back to the previous firm."

[¶27] The Board found Miller disclosed Ulteig's financial information relating to its transportation department. The financial information included a reference to the "$600,000 in engineering fees that are being managed by departing employees." The information also included a summary of Ulteig's transportation department revenue for the years 2007, 2008, 2009, and the projected revenue for 2010. The information from Miller included comments from Olson that some of it should be removed because it referred too closely to the "previous company."

[¶28] After a review of the record, we conclude the Board's decision that Miller violated N.D. Admin. Code § 28-03.1-01-09 is supported by a preponderance of the evidence; a reasoning mind reasonably could have decided the Board's factual conclusions were proven by the weight of the evidence from the entire record. We reverse that part of the district court judgment relating to Miller's violation of N.D. Admin. Code § 28-03.1-01-09.

C

[¶29] The Board found Paustian violated N.D. Admin. Code § 28-03.1-01-09 by downloading contents of Ulteig's computer hard drive onto an external hard drive in early October 2010 after deciding to join Apex. The Board found in an earlier deposition Paustian testified he plugged the same external hard drive into his Apex laptop, which constituted disclosure to Apex.

[¶30] On October 8, 2010, Olson, Welle, Berg, and Miller held a meeting to invite Ulteig employees, including Paustian, to become Apex employees and stockholders. The meeting agenda included a discussion on confidentiality and a "[c]aution on downloading information."

[¶31] According to Paustian's deposition testimony in the civil litigation and an expert digital forensic analysis of Ulteig and Apex devices, Paustian downloaded the

9

contents of his Ulteig computer hard drive onto an external hard drive. After Paustian testified he did not remember downloading his Ulteig hard drive onto an external hard drive at the Board hearing, his deposition testimony was used to impeach him. Paustian testified in his deposition he downloaded the contents of his Ulteig laptop hard drive onto an external device. At the Board hearing, Paustian also testified he did not know if he attached his external hard drive to an Apex device. Paustian testified in his deposition that he attached the external hard drive to his Apex laptop. At the hearing, Paustian agreed some of the files copied from the Ulteig hard drive would have been covered under Ulteig's definition of confidential information. The forensic analysis confirmed Paustian's external hard drive had over 35,000 unique files that were also on Ulteig computers. The forensic analyst's report concluded that "multiple removable storage devices connected to Ulteig computers were also connected to Apex computers. Additionally, many non-system user files located on Ulteig computers were also located on Apex computers and storage devices. These files included documents and information identified by Ulteig as proprietary."

[¶32] On the basis of the entire record, including Paustian's testimony and the expert forensics analysis, we conclude the Board's decision that Paustian violated N.D. Admin. Code § 28-03.1-01-09 is supported by a preponderance of the evidence. A reasoning mind reasonably could have decided Paustian, as an agent of Apex, disclosed Ulteig's confidential information to Apex. We reverse that part of the district court judgment relating to Paustian's violation of N.D. Admin. Code § 28-03.1-01-09.


IV

[¶33] The Board found Berg, Miller, and Welle violated N.D. Admin. Code § 28-03.1-01-10 by failing to disclose to Ulteig their intention to resign from Ulteig and form a competitive firm. The required disclosures of a conflict of interest are outlined in N.D. Admin. Code § 28-03.1-01-10, reading in part:

10

Registrants shall make full prior disclosures to their employers or clients of all known or potential conflicts of interest that could influence or appear to influence their judgment or the quality of their services.

1. If the employer or client objects to such an association or financial interest, the registrant shall either terminate the association or interest or offer to give up the employment.

[¶34] The Board determined Welle, Miller, and Berg, prior to the termination of their employment with Ulteig, had a known or potential conflict of interest that could influence their judgment or the quality of their services. Specifically, the Board found a violation occurred by failing to disclose to Ulteig their participation in the formation and planning of a competitive business while continuing to have access to Ulteig's confidential information and acting on Ulteig's behalf. During this time Welle was a member of Ulteig's board of directors, Miller was the vice president of Ulteig's transportation department, and Berg was a project manager who reported to Welle. While forming Apex, Welle, Miller, and Berg met with Ulteig's existing and potential clients and discussed existing and future projects. They also participated in or had authority over projects they believed Ulteig would not be able to complete after their departure from Ulteig. The Board found these actions could have influenced their judgment or the quality of their services to Ulteig.

[¶35] The Board's factual findings regarding Welle's, Miller's, and Berg's failure to disclose a known or potential conflict of interest are supported by a preponderance of the evidence. On the basis of the entire record and the broad language of N.D. Admin. Code § 28-03.1-01-10, a reasoning mind reasonably could have decided that their judgment and services either were influenced or could have been influenced by their decision to form a competing firm. We affirm those parts of the district court's judgments relating to the violation of N.D. Admin. Code § 28-03.1-01-10 by Welle, Miller, and Berg.

V

[¶36] The Board found Berg, Olson, Welle, and Apex, through its principals, violated N.D. Admin. Code § 28-03.1-01-12(6), relating to restrictions on the solicitation of work:

> A registrant shall not knowingly seek or accept employment for professional services for an assignment for which another registrant is employed or contracted to perform. This prohibition shall not preclude a registrant from responding to a client-initiated or owner-initiated solicitation.

[¶37] The Board found Welle, Olson, Berg, and Apex violated N.D. Admin. Code § 28-03.1-01-12(6) by targeting Ulteig projects after forming Apex. The Board's findings primarily derive from the emails sent by Olson and the Apex business plan. Both the emails and Apex's business plan discuss the possibility of taking over work from Ulteig following the Respondents' departure from Ulteig.

[¶38] The Board's findings noted a Ulteig project in Jamestown as an example. Apex obtained work as a subcontractor on the project following the Respondents' departure from Ulteig. The Board found Berg, as Ulteig's project manager on the project, contacted the Jamestown city engineer Reid Schwarzkopf following Berg's resignation from Ulteig. Before speaking with Berg, Schwarzkopf spoke with a Ulteig representative who assured Schwarzkopf Ulteig would get the project finished. After speaking with Berg, Schwarzkopf requested a meeting between Ulteig, Jamestown, and Apex, and Apex was subsequently retained as a subcontractor on the project. The Board found Apex's employment did not arise because of a client-initiated solicitation.

[¶39] There is evidence contrary to the Board's findings on the violations of N.D. Admin. Code § 28-03.1-01-12(6). The evidence includes testimony from Schwarzkopf indicating that he did not believe Apex or the Respondents coerced the City of Jamestown into awarding the subcontract to Apex. There is also an absence of direct evidence of solicitation, and the evidence of solicitation is circumstantial.

[¶40] Our standard of review precludes us from making independent findings of fact or substituting our judgment for that of the Board. *Singha*, 1998 ND 42, ¶ 14, 574

12

N.W.2d 838 (citing *Briggs*, 448 N.W.2d at 610). Our review is limited to deciding whether a reasoning mind reasonably could have decided the findings made by the Board were proved by the weight of the evidence from the entire record. *Power Fuels*, 283 N.W.2d at 220.

[¶41] The record includes numerous emails between the Respondents, before their departure from Ulteig, contemplating and anticipating completing work for Ulteig after leaving Ulteig. One of the emails read, in part:

> If Ulteig refuses to go along with an agreement to complete projects that are ongoing, we would then have to <u>convince the clients to terminate Ulteig to allow us to complete the work</u>.

(Emphasis added). When questioned about this, Berg and Olson agreed the statement violated N.D. Admin. Code § 28-03.1-01-12(6).

[¶42] A memo intended to be circulated to Apex employees after it began operations also addressed potential contact with Ulteig's clients. That memo read, in part, as follows:

> a. Explain that we will be offering to work as a sub-contractor to Ulteig to complete pending projects. We will encourage the Client and Ulteig to meet and discuss options for projects that are under contract. Explain that we will gladly complete any project that is under contract, but that we will not try to influence the decision of whether we remain involved or not.
>
> b. If we are allowed to complete a project as a sub to Ulteig, we will assign the project manager and staff that were previously working on the project.

[¶43] Drafts of Apex's business plan included a discussion that initial revenue estimates depended on Ulteig clients being willing to insist on keeping the existing work with the current project managers that would be leaving to join Apex. The final version of the Apex business plan included the statement that "[i]t is also our intention to offer to complete current contracts that Ulteig holds but will not be able to complete now that key individuals are no longer with the company." The district court correctly noted that many of the emails and the memo to employees included

13

statements that Apex employees should take care not to interfere with Ulteig's contracts. However, the emails also discuss convincing the client to terminate Ulteig, and the memo suggests employees offer to complete work as a subcontractor to Ulteig and encourage meetings between the client and Ulteig to discuss options for completing ongoing projects. While it is possible that a different set of inferences could be drawn from these facts, we cannot conclude reasoning minds could not have reasonably reached the factual conclusions reached by the Board or that the findings are not supported by the weight of the evidence. This is particularly true in light of the secrecy the Respondents engaged in during the formation of Apex.

[¶44] A preponderance of the evidence supports the Board's factual findings regarding the improper solicitation by Welle, Olson, Berg, and Apex. Those findings support a conclusion that Welle, Olson, Berg, and Apex knowingly sought or accepted employment for professional services for an assignment for which Ulteig was previously employed or contracted to perform in violation of N.D. Admin. Code § 28-03.1-01-12(6). We reverse those parts of the district court's judgments relating to the violation of N.D. Admin. Code § 28-03.1-01-12(6) by Welle, Olson, Berg, and Apex.

VI

[¶45] With regard to the Respondents' recovery of attorney fees on appeal from the Board's disciplinary decisions, the Board argues the 2015 version of N.D.C.C. § 43-19.1-25 should apply instead of the 2003 version. The award of attorney fees granted by the district court is moot given our affirmation of the Board's original decisions against Berg, Welle, Apex, Olson, Miller, and Paustian. We reverse the district court's award of attorney fees to Berg, Welle, Apex, Olson, Miller, and Paustian.

VII

14

[¶46]   We have considered the remaining arguments and conclude they are either unnecessary to our decision or without merit.  The district court judgments against Berg, Apex, Olson, Miller, Welle, and Paustian are affirmed in part and reversed in part.  The Board's orders against Berg, Apex, Olson, Miller, Welle, and Paustian are affirmed.

[¶47]   Jon J. Jensen
        Gary H. Lee, Dist. Judge
        Gerald W. VandeWalle, C.J.
        Jerod E. Tufte

        I concur in the result.
        Daniel J. Crothers

[¶48]   The Honorable Gary H. Lee, D.J., sitting in place of McEvers, J., disqualified.

**Tufte, Justice, concurring.**

[¶49]   I agree with the result reached by Justice Jensen's thorough majority opinion.

[¶50]   There is no challenge before us to the statutes or administrative code under which the Board disciplined the Appellees. Our occupational licensing cases describe the Legislative Assembly's broad, but not unlimited, authority to regulate the entry into, and practice of, various occupations. *Compare Johnson v. Elkin*, 263 N.W.2d 123, 128-29 (N.D. 1978) (reversing district court's determination that licensing requirement for house movers was unconstitutional under N.D. Const. art. I, §§ 1, 13, and 20, and citing cases upholding licensing of pharmacists, taxicabs, and garbage collection) *with State v. Cromwell*, 72 N.D. 565, 9 N.W.2d 914, 921 (1943) (examining whether "a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects" and declaring unconstitutional under N.D. Const. art. I, §§ 1 and 13, a statute prohibiting practicing photography without a license).

[¶51]   We recently recognized "North Dakota has a strong public policy against non-compete agreements." *Osborne v. Brown & Saenger, Inc.*, 2017 ND 288, ¶ 13, 904 N.W.2d 34. The disciplinary action taken by the Board against these professional

15

engineers is supported by the law and the code of ethics. It also has a serious anti-competitive effect. Under the Board's reading of N.D. Admin. Code § 28-03.1-01-10, an engineer may not plan or prepare to start an independent engineering business without first telling his current employer about his plans. Small steps toward an independent business, including saving start-up capital, evaluating office locations, or drafting a business plan (whether for imminent use or many months in the future), may subject registered professional engineers to discipline for failing to make "full prior disclosures to their employers . . . of all known or potential conflicts of interest that could influence or appear to influence their judgment." N.D. Admin. Code § 28-03.1-01-10.

[¶52]   An engineering firm may not by contract restrict its employees from starting an independent business in competition with it. N.D.C.C. § 9-08-06. The only exception to this broad rule permits restriction of a business owner within a specific county or city. N.D.C.C. § 9-08-06(1) and (2). Although such a contract is prohibited, a substantially equivalent result may be obtained by filing ethics charges with the Board. An engineer risks discipline, including suspension or revocation of the required occupational license, if any steps toward competing with a current employer are taken before leaving employment. Any such steps may fairly be considered a potential conflict of interest that could appear to influence the engineer's judgment. N.D. Admin. Code § 28-03.1-01-10. Now that Apex and the Appellees, each of whom has an ownership interest in Apex, are incumbents, they have little incentive to challenge any regulatory excesses that erect barriers to its engineer employees who may someday wish to depart Apex and compete with it.

[¶53]   Whether or not this is wise policy is not for the courts to say. If, in enacting N.D.C.C. § 43-19.1-24, the Legislative Assembly did not intend to permit the Board to impose the sort of restraint on lawful business that is broadly precluded by N.D.C.C. § 9-08-06, it has within its power the ability to strike a different balance through further legislation.

16

[¶54]   Jerod E. Tufte
Daniel J. Crothers