2000 ND 134
**Ebenezer M. SINGHA, Plaintiff, Appellant and CrossAppellee,**

v.

**NORTH DAKOTA STATE BOARD OF MEDICAL EXAMINERS, and Rolf Sletten, Executive Secretary and Treasurer of the North Dakota Board of Medical Examiners, Defendants, Appellees and Cross–Appellants.**

No. 990393.

Supreme Court of North Dakota.

June 29, 2000.

Rehearing Denied Aug. 18, 2000.

---

Roger R. Sundling and Alvin O. Boucher, Robert Vogel Law Office, Grand Forks, N.D., for plaintiff, appellant and cross-appellee.

John M. Olson, Special Assistant Attorney General, Bismarck, N.D., for defendants, appellees and cross-appellants.

KAPSNER, Justice.

[¶ 1] Ebenezer M. Singha appealed a judgment affirming in part and reversing in part a State Board of Medical Examiners' decision finding he did not meet the educational requirements for a license to practice medicine in North Dakota and denying his application. The Board cross-appealed from the part of the judgment reversing its decision that Singha's deceit and misrepresentations rendered him unfit for licensure. We affirm the Board's decision that Singha did not meet the educational requirements for licensure.

I

[¶ 2] In *Singha v. North Dakota State Bd. of Med. Exam'rs*, 1998 ND 42, ¶¶ 2–3, 574 N.W.2d 838, we described some of the factual background for Singha's application for a license to practice medicine in North Dakota:

Singha, a 1990 graduate with a "diploma in osteopathy" from the British School of Osteopathy (B.S.O.), applied to the Board in April 1995 for a license to practice medicine. As relevant to Singha's application, N.D.C.C. § 43–17–18(3) outlines certain requirements for licensure "[i]f the applicant is a graduate of a medical or osteopathic college that has not been approved by the board or accredited by an accrediting body approved by the board at the time the degree or its equivalent was conferred." The B.S.O. was not approved by the Board and was not accredited by an accrediting body approved by the Board when Singha received his diploma in

osteopathy, and the essence of this case is whether Singha qualified for licensure under the educational requirements of N.D.C.C. § 43–17–18(3).

While attending the B.S.O., Singha received additional clinical training at hospitals in Pennsylvania, and he self-studied pharmacology and biochemistry. In 1991, Singha was accepted in a family practice residency program at the University of North Dakota Medical School. In 1991 and 1993, the Board assisted Singha in sitting as a courtesy candidate for a Federal Licensing Examination (F.L.E.X.) administered in Ohio. Singha successfully completed the F.L.E.X. in 1993, and in September 1995, he successfully completed the three-year family practice residency program at UND.

[¶ 3] In *Singha*, 1998 ND 42, ¶ 1, 574 N.W.2d 838, we held N.D.C.C. § 43–17–18(3) requires a foreign-educated applicant for a North Dakota medical license to demonstrate the kinds of courses taken at a foreign educational institution, when combined with the successful completion of three years of Board-approved postgraduate training, are substantially equivalent to the kinds of courses required at a reputable medical or osteopathic college in the United States, and the successful completion of one year of Board-approved postgraduate training.[1] We rejected Singha's argument the Board was estopped from denying him a license because it had a duty to properly advise him about the requirements for licensure and led him to believe he would be granted a license after completing the three-year family practice residency program at UND. *Singha*, at ¶¶ 33–34. We also held the Administrative Agencies Practices Act, N.D.C.C. ch. 28–32, applied to the Board's consideration of an application for a license. *Singha*, at ¶ 1. Because the Board failed to comply with the procedural requirements of

---

1. Section 43–17–18, N.D.C.C., was amended by 1997 N.D. Sess. Laws ch. 372, § 2, and now says graduates of osteopathic schools located outside the United States are not eligible for licensure in North Dakota. *See Singha*, 1998 ND 42, ¶ 18 n. 1, 574 N.W.2d 838.

N.D.C.C. ch. 28–32 in deciding Singha's application, we remanded for proceedings consistent with those requirements and our interpretation of N.D.C.C. § 43–17–18(3). *Singha,* at ¶¶ 32, 39.

[¶ 4] On remand, an administrative law judge ("ALJ") was appointed to make a recommendation on Singha's application. After an administrative hearing, the ALJ recommended granting Singha a license. The ALJ recommended finding Singha's B.S.O. education, including his self-study of pharmacology and biochemistry and his clinical externships in Pennsylvania, was substantially equivalent to the training a majority of osteopathic students receive in the United States. The ALJ recommended finding if there were any deficiencies in Singha's B.S.O. education, they were more than compensated for by his three years in the UND family practice residency program. The ALJ commented that he "gave great weight to the testimony of those doctors from the UND family practice residency program who testified for Singha" and were all satisfied he was "competent to practice medicine in North Dakota." The ALJ also recommended finding Singha did not intentionally deceive the Board, the UND residency program, or anyone else about his educational credentials or B.S.O. degree.

[¶ 5] The Board rejected the ALJ's recommendation, finding Singha did not meet the educational requirements for licensure. The Board decided Singha's self-study and clinical externships could not be considered under N.D.C.C. § 43–17–18(3). The Board found Singha's B.S.O. education and successful completion of three years of Board-approved postgraduate training at the UND family practice residency program were not substantially equivalent to the kinds of courses taken at a reputable osteopathic college in the United States and the successful completion of one year of Board-approved postgraduate training. The Board also concluded Singha's deceit and misrepresentations in the application process rendered him unfit for licensure.

The district court affirmed the Board's decision Singha did not meet the educational requirements for licensure and reversed the Board's decision Singha's deceit and misrepresentations rendered him unfit for licensure. Singha appealed, and the Board cross-appealed.

II

[¶ 6] Under N.D.C.C. § 28–32–19, we affirm the Board's decision unless it is not in accordance with the law; it violates Singha's constitutional rights; the Board failed to comply with the provisions of N.D.C.C. ch. 28–32; the Board's rules or procedures have not afforded Singha a fair hearing; the Board's findings of fact are not supported by a preponderance of the evidence; or the Board's conclusions of law and decision are not supported by its findings of fact.

[¶ 7] In *Singha,* 1998 ND 42, ¶ 14, 574 N.W.2d 838, we outlined our deferential standard of review of the factual basis of a decision by the Board:

> Our review of the factual basis for the Board's decision involves a three-step process to decide whether its findings of fact are supported by a preponderance of the evidence, its conclusions of law are supported by its findings of fact, and its decision is in accordance with the law and is supported by its conclusions of law. In applying the preponderance-of-evidence standard, we do not make independent findings of fact or substitute our judgment for that of the Board; rather, we decide only whether a reasoning mind reasonably could have decided the Board's factual conclusions were proved by the weight of the evidence from the entire record. It is not our function to act as a super board when reviewing decisions by an administrative agency. In technical matters involving agency expertise, we have acknowledged the agency decision is entitled to appreciable deference.

## III

[¶ 8] Singha argues the Board's decision is not in accordance with the law, its findings of fact are not supported by a preponderance of the evidence, and its conclusions of law are not supported by its findings of fact, because the Board interpreted N.D.C.C. § 43–17–18(3) too narrowly and did not consider his clinical externships in Pennsylvania and his self-study of pharmacology and biochemistry. He argues the Board erred in requiring his B.S.O. education to be the mirror image of the education at an osteopathic college in the United States.

## A

▪ [¶ 9] In *Singha*, 1998 ND 42, ¶ 20, 574 N.W.2d 838, we recognized the Board has discretion to assess the substantive merits of an applicant's qualifications for a medical license, and we rejected an interpretation of N.D.C.C. § 43–17–18(3) which would require the Board to give carte blanche approval to any foreign educational institution that used a form of the word osteopath in its title, or offered some level of osteopathic education. We declined to construe N.D.C.C. § 43–17–18(3) to permit an entity other than the Board to decide a foreign-educated applicant's qualifications for licensure. *Singha*, at ¶ 22. We construed N.D.C.C. § 43–17–18 as a whole to establish a minimum educational threshold requiring the Board to compare the kinds of courses taken at a foreign institution with the kinds of courses required at a reputable osteopathic college in the United States. *Singha*, at ¶ 22. We interpreted N.D.C.C. § 43–17–18(3) to require a foreign-educated applicant to demonstrate the kinds of courses taken at a foreign institution, when combined with the successful completion of three years of Board-approved postgraduate training, were substantially equivalent to the kinds of courses required at a reputable medical or osteopathic college in the United States and the successful completion of one year

of Board-approved postgraduate training. *Singha*, at ¶ 22.

[¶ 10] Our decision in *Singha* recognizes the Board's statutory authority to assess the substantive merits of a foreign-educated applicant's educational qualifications and to decide whether the kinds of courses taken at a foreign institution and three years of postgraduate training are substantially equivalent to the kinds of courses required at an osteopathic college in the United States and one year of postgraduate training. Here, although Singha's clinical externships in Pennsylvania and his self-study of biochemistry and pharmacology may have been completed while he was enrolled at the B.S.O. with its knowledge and consent, the externships and self-study were not part of the B.S.O. curriculum. Nothing in N.D.C.C. § 43–17–18 or *Singha* requires the Board to accept Singha's clinical externships or his self-study as the substantial equivalent of courses required at a reputable osteopathic college in the United States. For foreign-educated applicants, N.D.C.C. § 43–17–18(3) and *Singha* require comparison of the kinds of courses taken at a foreign institution and three years of postgraduate training with the kinds of courses required at a reputable osteopathic college in the United States and one year of postgraduate training. As we explain, the Board compared Singha's educational qualifications as required by N.D.C.C. § 43–17–18(3) and *Singha*, and we reject his claim the Board misapplied the law and required his B.S.O. education to be a mirror image of the education required at an osteopathic college in the United States.

## B

▪ [¶ 11] Singha argues the weight of the evidence supports his licensure and the Board's denial is not supported by a preponderance of the evidence. He claims the Board erred in not giving appropriate weight to his extra two years in the UND family practice residency program and the testimony of his UND instructors to cure

. .

any deficiencies in his education. He argues the totality of his training made him a competent physician with skills and abilities equivalent to a physician educated in the United States. We conclude, however, the Board's finding that Singha's educational qualifications were not substantially equivalent to the educational qualifications of a physician educated in the United States is supported by a preponderance of the evidence.

[¶ 12] Dr. Gerald Osborne, the acting dean at the College of Osteopathic Medicine at Michigan State University and the president of the National Board of Osteopathic Medical Examiners, testified there was only a "distant comparison" and "extraordinary differences" between osteopathic education in Great Britain and the United States. Dr. Osborne testified osteopathic students in Great Britain are trained only to do manipulative treatment, which is just one component of what osteopathic students are trained to do in the United States. Dr. Osborne indicated a diploma of osteopathy received from the B.S.O. is not a doctoral level degree, and a comparison of the quality of a foreign osteopathic school with an osteopathic school in the United States requires more than looking at course names, numbers, and hours to measure equivalency. Dr. Osborne opined the instructional level at the B.S.O. was "not even close" to the quality of the instructional level at a college of osteopathy in the United States. Dr. Osborne testified a diploma awarded from the B.S.O. in 1990 was "absolutely" not equivalent to a degree awarded from an osteopathic college in the United States and indicated the B.S.O. education was more equivalent to training given at a chiropractic school in the United States. Dr. Osborne also reviewed documentation about Singha's performance during his UND family practice residency and testified "unequivocally, with this kind of performance in the family practice residency at Michigan State University, [Singha] would have been asked to leave the program." Based upon his review of Singha's credentials, Dr. Osborne testified he did not believe Singha was qualified to practice medicine in the United States.

[¶ 13] Dr. Ralph Dunnigan, a former member of the Board and a former director of the UND family practice residency program in Bismarck, testified the traditional process for obtaining a license to practice medicine in the United States requires a four-year undergraduate degree, a four-year degree from an accredited medical or osteopathic school, and completion of a residency program. Dr. Dunnigan emphasized the education at a United States medical school consists of two years of basic science and two years of clinical science consisting of structured didactic training and clinical work on wards. Dr. Dunnigan explained medical school emphasizes collegiality and integration of students as a required educational experience. Dr. Dunnigan testified a resident's didactic training was much more limited than a medical school student's didactic training. Dr. Dunnigan testified the didactic educational experience was a significant part of a medical school education and a three-year residency program could not make up for a deficiency in a medical school education.

[¶ 14] The Board's decision compared Singha's education at B.S.O. and his three years of postgraduate training at UND with the kinds of courses required at a reputable osteopathic college in the United States and one year of postgraduate training. The Board found the B.S.O. "diploma in osteopathy" was an undergraduate program which prepared a person to practice osteopathy as recognized in Great Britain; osteopathic medicine in Great Britain was not the same as in the United States; British osteopaths were not taught to evaluate health problems and were not able to provide general medical service; the courses taught at the B.S.O. were taught at an undergraduate level to familiarize students with osteopathy and enable them to know their limitations, rather than to

equip them to practice medicine; the B.S.O. curriculum was deficient when compared to a traditional United States medical school curriculum; the B.S.O. and United States osteopathic schools were not substantially similar; Singha did not demonstrate the kinds of courses he took at the B.S.O. were similar to the kinds of courses required by osteopathic colleges in the United States; Singha's externships did not provide him the benefit of a structured didactic component of medical school, which third and fourth year United States medical students received during clinical rotations; and Singha's self-study in biochemistry and pharmacology were not part of the B.S.O. curriculum and no educational institution supervised or gave him credit for his self-study. The Board explained the ALJ inappropriately considered Singha's self-study and clinical externships in evaluating his eligibility for licensure under N.D.C.C. § 43–17–18(3), because they were not courses taken at a foreign educational institution. The Board found even if Singha's externships and self-study could be considered under N.D.C.C. § 43–17–18(3), he did not produce sufficient evidence to compare his externships with the clinical education of a medical student and his self-study with classes required at a medical or osteopathic college in the United States.

[¶ 15] The Board also cited testimony from Singha's preceptors in the UND family practice residency program to the effect that Singha could not have completed the program without an adequate fund of knowledge of the basic sciences and that they believed he could practice medicine in an unsupervised setting. The Board explained N.D.C.C. § 43–17–18(3) does not authorize issuance of a license to practice medicine based on opinions the foreign graduate is qualified to practice medicine; rather, the statute requires a comparison of the foreign graduate's education with the education required at an osteopathic college in the United States. The Board decided Singha did not meet his burden to demonstrate the kinds of courses he took

at the B.S.O., coupled with the successful completion of three years of Board-approved postgraduate training, were substantially equivalent to the kinds of courses taken at a reputable medical or osteopathic college in the United States and the successful completion of one year of Board-approved postgraduate training.

[¶ 16] Although there is evidence Singha's preceptors at the UND family practice residency program believe he was qualified for licensure, there is also evidence in the record from which a reasoning mind reasonably could have found Singha did not meet the educational requirements for licensure. Issues involving educational qualifications for licensure involve technical matters subject to the Board's expertise. *See Singha,* 1998 ND 42, ¶¶ 14, 22, 574 N.W.2d 838. Under our deferential standard of review, we conclude a reasoning mind reasonably could have found Singha did not meet the educational requirements for licensure in N.D.C.C. § 43–17–18(3). The Board adequately explained its rationale for rejecting the ALJ's recommendation, and the Board's findings are supported by a preponderance of evidence. The Board's findings support its conclusion Singha did not meet the educational requirements for licensure under N.D.C.C. § 43–17–18(3).

IV

[¶ 17] Singha argues the Board violated his constitutional right to a fair hearing under the due process clauses of the federal and state constitutions and his statutory right to a fair hearing under N.D.C.C. ch. 28–32.

A

[¶ 18] Singha claims the Board prejudged his application and was not an impartial decision maker.

■ [¶ 19] Assuming without deciding that Singha's interest as an applicant for a license to practice medicine is a constitutionally protected property or liberty right

that is more than a unilateral expectation, he has not demonstrated the Board prejudged his application or was biased. Singha relies on press releases by the Board's executive secretary reviewing this Court's decision in *Singha* and indicating the Board could accept the ALJ's recommendation to grant the license or "more likely do their own review of the case and again deny it." Singha's reliance on press releases by the executive secretary is misplaced because the executive secretary is not a member of the Board.

■ [¶ 20] Singha also claims a "review of trial transcripts" prepared by one Board member, Dr. Zachary Morris, demonstrates bias. Dr. Morris's statements were made in a document circulated to the Board while the ALJ's recommendation was pending before the Board. Chapter 43–17, N.D.C.C., authorizes the Governor to appoint a ten-person Board to decide applications for a medical license. Inherent in the creation of a collegial, multi-person Board is the authority for individual Board members to comment on the evidence and exchange opinions about pending applications. Dr. Morris's statements reflect his review and analysis of evidence presented at the administrative hearing and are insufficient to show the Board was an impartial decision maker. *See Opdahl v. Zeeland Pub. Sch. Dist.*, 512 N.W.2d 444, 447 (N.D.1994) (stating the existence of a generalized attitude prior to a hearing is not necessarily a disqualifying bias and a presumption exists officials regularly perform their duties by refusing to allow any preconceived biases or judgment from interfering with a decision based on evidence presented at a hearing). Singha has not overcome the presumption the Board regularly performed its duty and refused to allow any preconceived biases from interfering with a decision based on evidence presented at the administrative hearing.

### B

[¶ 21] Singha argues the Board improperly considered evidence not introduced at the administrative hearing. He claims that evidence consisted of a chiropractic school catalogue, Dr. Morris's statements, and written materials prepared by another Board member, Dr. David Rinn.

[¶ 22] Nothing in this record indicates the Board considered the chiropractic catalogue or any other evidence not introduced at the administrative hearing. The written statements by Dr. Morris and Dr. Rinn represent their analysis of the evidence from the administrative hearing, with cites to the record, and the Board's consideration of those statements was not improper. We conclude the Board did not violate Singha's constitutional or statutory right to a fair hearing.

### V

■ [¶ 23] Singha argues the Board did not comply with N.D.C.C. ch. 28–32, because there were impermissible ex parte contacts between the Board and the Board's litigation counsel and its executive secretary. *See Scott v. North Dakota Workers Comp. Bur.*, 1998 ND 221, 587 N.W.2d 153.

[¶ 24] In *Scott*, 1998 ND 221, ¶¶ 8–18, 587 N.W.2d 153, we considered an issue involving the Bureau's ex parte contacts with its outside litigation counsel about a pending ALJ recommendation. In *Scott*, at ¶¶ 8, 10, the Bureau's outside counsel represented the Bureau at an administrative hearing before an ALJ, consulted with the Bureau's director of claims and rehabilitation, advised the director the ALJ's recommendation should be rejected, and drafted several versions of findings, conclusions, and orders for the director to review. All of those ex parte contacts were without the knowledge or participation of the claimant or his attorney, and the claimant received no notice or copies of the Bureau's outside counsel's proposed findings, conclusions and orders prior to issuance of the final order. *Id.* at ¶ 8.

[¶ 25] We concluded the provisions of N.D.C.C. § 28–32–12.1(3) and (5) and N.D.C.C. § 28–32–17(4)(i) and (k) prohibited the Bureau's outside litigation counsel from making those ex parte contacts with the Bureau's director of claims and rehabilitation. *Scott,* 1998 ND 221, ¶¶ 9–10, 587 N.W.2d 153. We decided the clear intent of those statutes was to prohibit ex parte contacts between the decision maker and persons who participated in the hearing or otherwise had an interest in the case. *Id.* at ¶ 10. We concluded the Bureau's ex parte contacts with its outside counsel in that case clearly violated those statutory proscriptions. *Id.* We also concluded N.D.C.C. § 28–32–12.1(2), which allows an agency head or hearing officer to communicate with and receive aid from staff assistants if those assistants do not furnish, augment, diminish, or modify the evidence in the record, was intended to ensure staff assistance is available for the decision maker and was not intended to supersede the protections afforded by the specific provisions of N.D.C.C. § 28–32–12.1, prohibiting ex parte communications from persons who participated in an administrative hearing. *Scott,* at ¶ 11.

[¶ 26] Here, the ALJ issued his recommended decision on November 5, 1998. On November 13, 1998, the Board and its executive secretary, who was present at the administrative hearing before the ALJ, met and discussed the ALJ's recommendation. The minutes of that meeting do not reflect any inappropriate ex parte communications. Rather, those minutes reflect the executive secretary suggested the Board review the record before it acted either to accept or reject the ALJ's recommendation and "if you were entirely comfortable with his recommendations, then I would say there would be no point in ordering the transcript. But if you're thinking that perhaps you won't accept his recommendations, I think you should order the transcript or the whole record." The Board then voted to review the record. *Scott* was decided on December 22, 1998. In January 1999, the executive secretary forwarded copies of the transcript of the administrative hearing and exhibits to Board members and informed the Board that he and counsel who represented the Board at the administrative hearing would not be available for advice about the ALJ's recommendation. Thereafter, another assistant attorney general was appointed to advise the Board about the ALJ's recommendation.

[¶ 27] According to an affidavit of the Board's executive secretary, his participation was limited to procedural developments and logistical arrangements, and he did not discuss the merits of the case with any Board member while the ALJ's recommendation was pending. According to an affidavit of counsel who represented the Board at the administrative hearing, he did not communicate with the Board about the merits of the case while the ALJ's recommendation was pending. The record does not support Singha's claims there were improper ex parte communications in this case. *Compare Lawrence v. North Dakota Workers Comp. Bur.,* 2000 ND 60, ¶ 10, 608 N.W.2d 254 (stating Bureau acknowledged ex parte communications about ALJ recommendation while recommendation pending); *Elshaug v. North Dakota Workers Comp. Bur.,* 2000 ND 42, ¶¶ 6–7, 607 N.W.2d 568 (citing documentation of ex parte communications about ALJ recommendation while recommendation pending); *Scott,* 1998 ND 221, ¶ 8, 587 N.W.2d 153 (stating Bureau acknowledged ex parte communications about ALJ recommendation while it was pending). We conclude any communications in this case were not impermissible ex parte contacts in violation of N.D.C.C. ch. 28–32 and *Scott.*

[¶ 28] Singha also argues the Board failed to provide him with notice of meetings at which the Board deliberated the ALJ's recommendation. Singha has cited no statutory or regulatory provisions requiring the Board to notify him of its review of the ALJ's recommendation. *See*

*Blanchard v. North Dakota Workers Comp. Bur.*, 1997 ND 118, ¶ 20, 565 N.W.2d 485 (stating agency is not required to adopt rules for review of a hearing officer's recommendation). We reject Singha's arguments the Board violated N.D.C.C. ch. 28–32.

## VI

[¶ 29] Singha argues he should be awarded attorney fees and costs under N.D.C.C. § 28–32–21.1, because the Board denied him a medical license without substantial justification. Singha has received the attorney fees ordered in the prior appeal, and because he has not prevailed in this civil judicial proceeding, he is not entitled to any further attorney fees related to this judicial review of the Board's decision. *See Singha*, 1998 ND 42, ¶ 38, 574 N.W.2d 838.

## VII

[¶ 30] We affirm the judgment.[2]

[¶ 31] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, WILLIAM A. NEUMANN, DALE V. SANDSTROM, JJ., concur.

2. Our affirmance of the Board's decision that Singha has not met the educational requirements for licensure in North Dakota is dispositive of this appeal, and it is not necessary for us to consider issues raised in the Board's cross-appeal.