2001 ND 131
**Bonnie KRAFT, Petitioner and Appellant,**

v.

**North Dakota STATE BOARD OF NURSING, Respondent and Appellee.**

No. 20000320.

Supreme Court of North Dakota.

July 20, 2001.

Rehearing Denied Aug. 30, 2001.

Carl O. Flagstad, Minot, ND, for petitioner and appellant.

Calvin N. Rolfson (argued), Special Assistant Attorney General for the Board of Nursing and Brian L. Bergeson (appeared), Rolfson Schulz Lervick & Geiermann Law Offices, P.C., Bismarck, ND, for respondent and appellee.

KAPSNER, Justice.

[¶ 1] Bonnie Kraft appeals from the district court order affirming, with one

exception, the order of the North Dakota State Board of Nursing ("Board"), which suspended for one year Kraft's license to practice nursing in North Dakota, and appeals from the district court order denying Kraft's motion for relief on the basis of alleged improper ex parte communications. We affirm the Board's order in all respects and affirm the district court's denial of the motion for relief.

I

[¶ 2]   In 1988, Kraft was licensed by the Board as a registered nurse. In November 1999, the Board filed a complaint against Kraft alleging that Kraft was observed to be under the influence of a chemical substance at work; refused her employer's request to submit to a chemical screening evaluation; was suspended from her employment as a result of her refusal to consent to the screening test; and was convicted of simple assault in April 1998.

[¶ 3]   After a hearing, the administrative law judge ("ALJ") recommended findings of fact and conclusions of law, as well as an order. The recommended findings indicated Kraft was observed at work on January 22, 1999, by two doctors and three nurses who reported Kraft slurred her speech, mispronounced two easy first names of patients, had problems with equilibrium, laughed frequently, and her breath smelled fruity like alcohol or acetone. Both doctors notified the nursing supervisor that Kraft needed a blood or urine test to detect chemical impairment. Kraft was transported to the emergency room where a nurse twice informed Kraft she needed to be medically screened to rule out the presence of any alcohol or drugs, and if she refused to be tested, hospital policy mandated her suspension from work. Kraft refused to be tested, without offering an explanation. Two emergency room nurses observed Kraft to

be agitated while talking on the phone apparently to an attorney. The nurses also observed Kraft to be belligerent, red-faced with dilated and red-rimmed eyes, and Kraft had difficulty speaking and gave inaccurate and unusual answers to the nurses' questions. Subsequently, Kraft was suspended from practicing at the medical center for refusing to take the required chemical tests. The medical center's published policy is that refusal to submit to a drug and alcohol test shall be considered a positive test and insubordination which may result in termination.

[¶ 4]   The ALJ stated the greater weight of the evidence did not show Kraft was obviously or definitely impaired by alcohol or a prohibited chemical substance at work; rather, the evidence showed Kraft was possibly or likely impaired. The ALJ indicated the doctors' observations of Kraft presented the possibility of a clear and present danger to patients, but Kraft possibly could have worked her shift without incident. The ALJ concluded Kraft did not refuse unreasonably a proper request of her employer to submit to a chemical evaluation, as Kraft based her refusal on her attorney's advice and on basic notions of unfairness because the medical center did not follow its own testing procedures; thus, Kraft did not have a "real opportunity to explain her situation." The ALJ noted the medical center's procedural irregularities in testing, such as not completing all required forms and failing to involve various other staff in the testing.

[¶ 5]   The evidence before the ALJ showed Kraft was arrested and charged with a misdemeanor assault for domestic violence in April 1998, after hitting and scratching a man at her home while she was under the influence of alcohol. Kraft pled guilty and spent three nights in jail. The ALJ concluded Kraft's conviction for misdemeanor assault is a crime of violence

of willfully causing bodily injury to another human being, which is "opposite" to the standards of nursing practice and adversely relates to the practice of nursing. Because five years had not passed since the assault, there was no presumption of rehabilitation, and no evidence showed Kraft was rehabilitated. However, because the assault was in Kraft's own home and she was intoxicated at the time, the ALJ recommended not subjecting Kraft to severe disciplinary action for committing this crime alone, as it was the only allegation in the complaint proved by the evidence. The ALJ recommended ordering a one-year suspension of Kraft's license, but not invoking the suspension unless Kraft further violated nursing practices within one year.

[¶ 6] The Board accepted some of the ALJ's recommendations, with the following exceptions. The Board found sufficient evidence to prove by a preponderance that Kraft came to work under the influence of a chemical substance. The failure of the medical center to complete its own chemical screening forms did not excuse Kraft's obligation to submit to the required chemical screening test, and her behavior was not excused by the ALJ's belief that Kraft was not given a real opportunity to explain her situation. The employer's technically incomplete fulfillment of its policy provisions does not bind the Board. The evidence need not show Kraft was definitely impaired, but rather the burden of proof requires a preponderance of the evidence showing her impairment. Thus, the Board concluded sufficient facts were presented at the hearing to demonstrate by a preponderance of the evidence that (1) Kraft engaged in actions inconsistent with the practice of nursing; (2) Kraft is unfit or incompetent to practice nursing by reason of negligence, patterns of behavior, or other causes established by the Board;

and (3) Kraft practiced nursing without sufficient knowledge, skills, or nursing judgment and in a manner inconsistent with acceptable nursing standards. The Board ordered Kraft's license to practice nursing suspended for one year, ordered Kraft to obtain chemical dependency and psychiatric evaluations from treatment professionals approved by the Board, and assessed a $1,000 penalty.

[¶ 7] Kraft appealed the Board's order to the district court and also moved for leave to obtain additional evidence, if the Board denied making improper ex parte communications, to prove the discipline imposed by the Board was excessive. The district court denied her motion, as Kraft cited no supporting authority or argument and did not say what additional evidence would be adduced or why it would be appropriate to allow her to supplement the record. Kraft then moved the district court to reconsider her motion for leave to obtain additional evidence, arguing the executive director of the Board and the Board's counsel participated in the hearing and later had improper ex parte communications influencing the Board's decision-making process, so additional evidence was necessary to determine the extent of the violation. The district court denied Kraft's motion for reconsideration on the basis that it was dilatory and because Kraft had "nothing but a hunch" that the executive director had engaged in anything other than ministerial acts outside her role as an expert witness at the hearing.

[¶ 8] Subsequently, the district court issued a memorandum opinion, affirming the Board's order except as to Kraft's refusal to submit to blood or urine testing. The district court agreed Kraft was under the influence of a chemical substance at work and her prior conviction for simple assault, with no evidence of rehabilitation, was inconsistent with the standards of

nursing practice. However, the district court disagreed that Kraft unreasonably refused to submit to a chemical and medical screening evaluation, as the medical center did not follow internal testing policies and procedures and Kraft's attorney advised her not to submit to testing.

[¶ 9] Kraft next moved for relief from the district court's order, alleging the minutes of the Board's meeting on March 16, 2000 and the affidavits of the Board's counsel and a registered nurse who investigates for the Board provided evidence of a systemic disregard of improper ex parte communications by the Board's counsel in advising the Board. The district court denied the motion, stating there was no authority for the motion, the argument was considered previously, and "[n]othing new is presented." Kraft appeals from this order and from the district court's order affirming the Board's decision.

## II

[¶ 10] On appeal from a district court's review of an administrative agency's decision, we review the agency decision, not the district court decision. *Vernon v. N.D. Workers Comp. Bureau*, 1999 ND 153, ¶ 8, 598 N.W.2d 139. However, the district court's analysis is entitled to respect if its reasoning is sound, because the legislatively mandated review by the district court cannot be ineffectual. *Sherman v. N.D. Workers Comp. Bureau*, 1998 ND 97, ¶ 7, 578 N.W.2d 517. We must affirm the agency's decision unless: (1) the agency's decision is not in accordance with the law, (2) the agency's decision violates the appellant's constitutional rights, (3) the agency failed to comply with the provisions of N.D.C.C. ch. 28–32 during its proceedings, (4) the agency rules or procedures have not afforded the appellant a fair hearing, (5) the agency findings of fact are not supported by a preponderance of the evidence, or (6) the agency's conclusions of law and decision are not supported by its findings of fact. N.D.C.C. §§ 28–32–19, 28–32–21; *see also Singha v. N.D. State Bd. of Med. Exam'rs*, 2000 ND 134, ¶ 6, 613 N.W.2d 34. Our review of the agency's findings of fact is limited to deciding whether a reasoning mind reasonably could have determined the factual conclusions were proven by the weight of the evidence based only on the record filed with the court. *Robertson v. N.D. Workers Comp. Bureau*, 2000 ND 167, ¶ 8, 616 N.W.2d 844; N.D.C.C. § 28–32–19. In deciding if the agency's findings of fact are supported by a preponderance of the evidence, we exercise restraint and do not substitute our judgment for that of the agency or make independent findings of fact. *Vernon*, at ¶ 8. In technical matters involving agency expertise, we acknowledge the agency decision is entitled to appreciable deference. *Singha*, at ¶ 7.

[¶ 11] Under N.D.C.C. § 43–12.1–14, the Board may take disciplinary action against a registered nurse to suspend, revoke, place on probation, or refuse to issue or renew a license, or to reprimand a licensee if the nurse:

1. Has been arrested, charged, or convicted by a court, or has entered a plea of nolo contendere to a crime in any jurisdiction that relates adversely to the practice of nursing and the licensee or registrant has not demonstrated sufficient rehabilitation under section 12.1–33–02.1;

. . . .

3. Has engaged in any practice inconsistent with the standards of nursing practice;

. . . .

5. Is unfit or incompetent to practice nursing by reason of negligence, patterns of behavior, or other causes

as established under rules adopted by the board[.]

[¶ 12] The administrative rules for disciplinary action against nurses are contained in N.D. Admin. Code § 54–02–07–01.1, which provides:

Practice inconsistent with acceptable standards of nursing practice by a licensee or registrant means behavior that may place a client or other person at risk for harm. Inconsistent practice includes incompetence by reason of negligence, patterns of behavior indicating the individual is unfit to practice nursing, as well as any of the following:

. . . .

5. Practice of nursing without sufficient knowledge, skills, or nursing judgment.

6. Performance of nursing interventions in a manner inconsistent with acceptable nursing standards.

### III

[¶ 13] Kraft appeals from the district court's order affirming the Board's decision, arguing (1) the Board failed to adequately discuss its findings of fact, conclusions of law, and order; (2) Kraft was not impaired at work or, alternately, if she was impaired, her employer had been forewarned and required her to work despite any impairment; (3) evidence of Kraft's refusal to submit to a chemical test should be considered along with all other factors in determining if she came to work impaired; (4) Kraft's conviction for simple assault is not a violation of the standards of nursing practice and does not relate adversely to nursing practice; and (5) the Board did not timely serve its order to Kraft.

### A

[¶ 14] Kraft contends the Board did not adequately discuss its findings of fact, conclusions of law, and order. Although Kraft concedes the Board has a statutory prerogative to substitute its own findings and conclusions for those of the ALJ, Kraft asserts the Board's decision still must be supported by a preponderance of the evidence. Kraft insists the Board presented a "one-sided interpretation of ... [t]he facts ... [which] are all self-serving." Kraft insists ALJs are experts in administrative hearings and interpretation of legal standards, whereas the Board consists of nurses who may not be as impartial, due to bias or pressures that may arise in an agency, or as well versed in standards of proof.

[¶ 15] Adjudicative proceedings are governed by N.D.C.C. § 28–32–13, which provides:

1. In an adjudicative proceeding an administrative agency shall make and state concisely and explicitly its findings of fact and its separate conclusions of law, and the order of the agency based upon its findings and conclusions.

2. If the agency head, or another person authorized by the agency head or by law to issue a final order, is presiding, the order issued is the final order....

3. If [such person] ... is not presiding, then the person presiding shall issue recommended findings of fact and conclusions of law and a recommended order ... [which] become final unless specifically amended or rejected by the agency head....

On appeal, we review an agency's findings of fact to ascertain if they are supported by a preponderance of evidence and review the agency's conclusions of law and order to determine if they are supported by its findings of fact. N.D.C.C. § 28–32–19(5), (6). Our review of the agency's findings of

fact is limited to deciding whether a reasoning mind reasonably could have determined the findings were proven by the weight of the evidence based only on the record filed with the court. *Robertson v. N.D. Workers Comp. Bureau,* 2000 ND 167, ¶ 8, 616 N.W.2d 844; N.D.C.C. § 28-32-19.

[¶ 16] As Kraft concedes, the Board has the prerogative to accept, amend, or reject an ALJ's recommended findings, conclusions, and order. In its final order, the Board specifically incorporated by reference the ALJ's recommendations after "[t]he evidence of the record was duly considered." The Board determined whether each allegation in the complaint had been proved by a preponderance of the evidence. The Board accepted specific recommendations of the ALJ, as proven or disproven by a preponderance of the evidence, but rejected the ALJ's recommended finding that Kraft was not under the influence of a chemical substance at work. In rejecting this recommendation, the Board thoroughly discussed facts presented at the hearing and concluded a preponderance of the evidence proved Kraft was chemically impaired while on nursing duty. *See Robertson,* 2000 ND 167, ¶ 8, 616 N.W.2d 844 (reviewing agency findings of fact based on whether a reasoning mind reasonably could have determined the findings were proven by the weight of the evidence on the entire record).

[¶ 17] The Board discussed the reports of medical professionals regarding Kraft's impaired condition, her refusal to submit to a chemical screening test, as well as her testimony that she periodically consumes alcohol despite her diagnosis as an alcoholic, her use of psychotropic medications, and her certification in psychiatric nursing. The Board also discussed Kraft's denial of drinking alcohol before presenting to work,

her claims of taking inhalers and cough syrup instead, and her testimony that she was "in shock" at being requested to submit to the chemical screening test. Thus, the Board's discussion of the facts was not "one-sided"; rather, the Board exhaustively discussed the facts to support its conclusion that a preponderance of the evidence demonstrated Kraft was impaired and engaged in actions inconsistent with standards of nursing. *See Vernon v. N.D. Workers Comp. Bureau,* 1999 ND 153, ¶ 8, 598 N.W.2d 139 (exercising restraint and not substituting our judgment for that of the agency or making independent findings of fact, when deciding if the agency's findings are supported by a preponderance of the evidence).

[¶ 18] Although Kraft claims the Board is composed of nurses who may not be as impartial or well versed in legal standards as the ALJ, the fact that nurses serve on the Board makes the Board better equipped to determine whether Kraft's actions were inconsistent with standards of nursing practice. *See Singha v. N.D. State Bd. of Med. Exam'rs,* 2000 ND 134, ¶ 7, 613 N.W.2d 34 (affording agency decisions appreciable deference in technical matters involving agency expertise).

[¶ 19] The Board properly rejected the ALJ's recommendations, meticulously describing its rationale in weighing the evidence. Moreover, Kraft failed to show the Board selected only evidence favorable to its decision and failed to state any basis for bias by the Board. Thus, we conclude a reasoning mind reasonably could have determined the agency's findings were proven by the weight of the evidence.

### B

[¶ 20] Kraft argues the evidence does not prove by a preponderance she was impaired at work, or alternately, if she was impaired, the medical center had been

forewarned and required her to work despite any impairment. Kraft contends she has asthma and sinusitis, and she had been using inhalers and taking antibiotics and cough syrup before reporting to work on January 22, 1999. According to Kraft, the evidence of her alcohol use from the hearing testimony was equivocal, as the witnesses stated Kraft's fruity breath could have been from alcohol or acetone. The witnesses also equivocated regarding Kraft's behaviors, as one doctor reported Kraft's speech was normal and she did not seem impaired, but only "giddy." Kraft then admits that "she was not fit to work on that day due to illness." Kraft claims she was ill, but the medical center required her to report to work although she called and requested to be excused.

■ [¶ 21] A preponderance of the evidence is "evidence more worthy of belief," "the greater weight of evidence," or "testimony that brings the greater conviction of truth." *Jimison v. N.D. Workmen's Comp. Bureau*, 331 N.W.2d 822, 824 (N.D. 1983) (citations omitted). That is, the preponderance standard is met by evidence which is more convincing or of greater weight than the opposing evidence, namely, evidence which as a whole shows the fact to be proved is more probable than not. *Black's Law Dictionary* 1182 (6th ed.1990). We have defined the preponderance of the evidence standard in terms of whether a reasoning mind reasonably could have determined factual conclusions reached were proved by the weight of the evidence from the entire record. *Nelson v. Cass County Soc. Servs.*, 424 N.W.2d 371, 372 (N.D.1988).

[¶ 22] The evidence indicates all witnesses who smelled Kraft's fruity breath on January 22, 1999 attributed the odor to either alcohol or ketoacidosis (also referred to as an odor of acetone or ketone). Testimony in the record establishes that ketoacidosis affects diabetic individuals, but Kraft admitted she is not diabetic and offered no evidence that her medications could produce such a breath odor. Two doctors and three nurses noted Kraft's unusual behavior, and both doctors believed Kraft was sufficiently impaired to promptly suspend her employment and require chemical screening under the medical center's policy. The same doctor who stated Kraft did not seem impaired, but only "giddy," testified that after he passed by her and noticed the "unmistakable" odor on her breath, he determined:

> [I]f you have reason to believe that someone is chemically impaired, ... you can't let them provide care. There are ... responsibilities that we all carry, and in this situation, the one that would come to mind first would be preparing and giving injections where you're capable of doing great harm if you're not a hundred percent.
>
> And—and that really, frankly, is why I pulled her off the job, is that this is—if she was, as we suspected, intoxicated, she represented a clear and present danger to the health of the patients....

*See* N.D. Admin. Code § 54–02–07–01.1 (indicating practice inconsistent with acceptable standards of nursing practice means behavior that may place a client or other person at risk for harm).

[¶ 23] The Board carefully discussed all the testimony by professional medical staff who observed Kraft to have a fruity odor consistent with impairment, bloodshot and dilated eyes, imbalance, mispronunciation of names, inappropriate laughter, and uncooperativeness. Kraft admitted being diagnosed as an alcoholic and having entered treatment previously. She also acknowledged being clinically depressed and taking psychotropic medication for the depression. Nevertheless, Kraft admitted she periodically consumes alcohol. In

light of her special certification in psychiatric nursing, the Board concluded Kraft knew or should have known that consuming alcohol with such medication impairs her judgment. Moreover, a physician testified none of her psychotropic medications produces an alcoholic-smelling breath.

[¶ 24] Kraft conceded in her brief she was "not fit" to work on January 22, 1999, purportedly due to her illness. Kraft contends she was required to come to work after calling her employer three times to report her illness; however, the evidence shows Kraft informed the medical center her daughter was ill, but did not mention her own illness. Kraft also informed her employer she would be at work but would merely be late as she was "working at Pediatrics and they were still seeing patients." However, the director of the medical center stated Kraft did not work in the pediatrics clinic that day. Kraft later informed her supervisor that when she arrived at the medical center, she put patients in the rooms and counted narcotics; however, other testimony indicated no narcotics were located at the clinic.

■ [¶ 25] It is the agency's responsibility to assess the credibility of witnesses and to resolve conflicts in the evidence. *Blanchard v. N.D. Workers Comp. Bureau*, 1997 ND 118, ¶ 23, 565 N.W.2d 485. We conclude a reasoning mind reasonably could have made the factual determination that Kraft's impairment at work was proven by the weight of the evidence from the entire record. This finding supports the Board's conclusion that Kraft was engaged in practices inconsistent with the practice of nursing; was unfit or incompetent to practice nursing by reason of negligence, patterns of behavior, or other causes established by the Board; practiced nursing without sufficient knowledge, skills, or nursing judgment; and performed nursing interventions in a manner inconsistent with acceptable nursing standards. *See* N.D.C.C. § 43-12.1-14(3), (5); N.D. Admin. Code § 54-07-01.1(5), (6).

C

■ [¶ 26] Kraft argues evidence of her refusal to submit to a chemical test for alcohol screening should be considered along with all the other factors to determine if she came to work impaired, because both the ALJ and the district court concluded her refusal to take the chemical test did not constitute evidence of alcohol usage.

■ [¶ 27] Conversely, the Board contends the district court erred in finding Kraft's refusal to submit to chemical testing did not violate nursing standards.[1] The Nurse Practices Act sets out legislative public policy in a statement of legislative intent. Specifically, N.D.C.C. § 43-12.1-01 establishes the vital role nurses play in public health, thus the practice of nursing "is subject to regulation and control in the public interest to assure that qualified, competent practitioners and high quality standards are available." The Board notes the public's health requires

---

1. Although the Board has not cross-appealed, an appellee for whom a favorable judgment was rendered may attempt to save the judgment by arguing, without cross-appealing, any ground asserted in the proceedings below. *See Tkach v. Am. Sportsman, Inc.*, 316 N.W.2d 785, 787 (N.D.1982); *see also N.D. Pub. Serv. Comm'n v. Jamestown Farmers Elevator, Inc.*, 422 N.W.2d 405, 407 (N.D.1988) (holding the administrative agency could not seek a more favorable result on appeal without cross-appealing); *Ward v. Shipp*, 340 N.W.2d 14, 18 n. 1 (N.D.1983) (indicating it is unnecessary for an appellee to file a cross-appeal when the judgment below is entirely favorable to the appellee, but may urge any ground asserted below).

the sober judgment of impairment-free nurses caring for their patients.

[¶ 28] Kraft misstates the conclusions of both the ALJ and the district court. The medical center's policies and procedures guide, as well as its employee handbook, state the policy that "[r]efusal to submit to a drug/alcohol test shall be considered to be a positive test." The ALJ found Kraft likely received a copy of the handbook or at least was made aware of it, so she knew or should have known about the policy regarding testing for drugs and alcohol and the results of failure or refusal to test. Kraft testified she refused the chemical testing because she believed she was not given an opportunity to explain herself; however, she admitted she did not assert an explanation at all. The ALJ concluded the medical center's failure to completely follow its own policies and procedures regarding chemical testing, as well as the advice of Kraft's attorney not to submit to the test, showed Kraft was *not unreasonable in refusing to be tested* (emphasis added). Thus, Kraft errs in stating the ALJ found her refusal to take the chemical test did not constitute evidence of alcohol usage. In fact, the ALJ stated:

> Therefore, although it may have been poor overall judgment on Kraft's part for her to have refused a test that may have exonerated her in regard to the observations made regarding her activities and behavior on January 22, 1999, it was not poor judgment specifically as to the mechanics of testing at [the medical center].... However, again, overall, Kraft used poor judgment in leaving the ER before the supervisory nurse came back to further pursue the matter of tests. Perhaps, [the medical center] would have gotten the matter straight *before Kraft was tested, i.e.*, the correct people would have been involved and *Kraft tested* in accordance with [the

medical center's] policy and procedure. (Emphasis added.)

The ALJ objected to the medical center's lack of strict compliance with the testing policy, but the ALJ never stated Kraft's refusal to submit to chemical testing did not violate nursing standards or not constitute evidence of alcohol usage.

[¶ 29] The district court agreed with the ALJ's findings, but concluded Kraft's refusal to submit to the chemical test did not constitute a violation of the Nurse Practices Act or grounds for discipline. However, on appeal from a district court's review of an administrative agency's decision, we review the agency decision, not the district court decision, while giving due respect to the reasoning of the district court. *Vernon v. N.D. Workers Comp. Bureau*, 1999 ND 153, ¶ 8, 598 N.W.2d 139; *Sherman v. N.D. Workers Comp. Bureau*, 1998 ND 97, ¶ 7, 578 N.W.2d 517. The Board thoroughly discussed the facts surrounding Kraft's refusal to test, after two doctors believed Kraft "was sufficiently out of control to immediately prevent her from working in the health care setting and to require her to take a chemical screening test":

F. [Kraft] was offered a chance by her employer to take a chemical screening test, as required by employer policy, to rule out any presence of alcohol or drug substances that might have caused her behavior that day, but she refused, reportedly upon the advice of her counsel.

G. The primary reason to refuse to take a chemical screening test is to avoid confirmation of the test results. [Kraft] presented no evidence to show she could not physically take such a test. Any failure of her employer to subsequently complete its own chemical screening forms perfectly does not excuse the

obligation of [Kraft] to submit to the chemical screening test as required by her employer and its policy.

. . . .

K. [Kraft's] refusal to take the required chemical screening test constituted an admission under [the medical center's] written policy that the test would have produced a positive result.

L. The belief by the ALJ in his Recommendations that [Kraft] was not given a "real opportunity" to explain her situation does not exonerate, explain nor excuse the behavior itself. Any action by [the medical center] regarding the technically . . . incomplete fulfillment of its policy provisions does not bind the Board.

M. All [medical center] employees are required to take chemical screening tests when requested. The belief by [Kraft] that she was "in shock" over having been asked to take chemical screening tests she knew she could be required to take as a [medical center] employee does not excuse or justify her conduct.

[¶ 30] Because a reasoning mind reasonably could have determined the Board's findings were proven by the weight of the evidence from the entire record, we conclude the Board did not err in considering Kraft's refusal to submit to chemical testing as an admission of a positive result and as a violation of nursing standards. *See Singha v. N.D. State Bd. of Med. Exam'rs,* 2000 ND 134, ¶ 7, 613 N.W.2d 34 (deferring to agency decisions, rather than substituting our judgment for that of the agency, because it is not our function to act as a super board when reviewing decisions by an administrative agency).

D

[¶ 31] Kraft argues her conviction for simple assault does not constitute a violation of nursing standards nor relate adversely to the practice of nursing. Kraft contends neither the ALJ nor the district court found a rational relationship between the criminal behavior and her professional license. The simple assault was committed while Kraft was off duty and off hospital premises, and Kraft insists it had nothing to do with her nursing profession because she did not place any patients at risk of harm. Kraft argues one incident of alcohol usage in a non-nursing environment does not constitute a pattern of practices inconsistent with nursing standards.

[¶ 32] The Nurse Practices Act statutorily entitles the Board to suspend the license of a registered nurse who has been arrested, charged, or convicted of a crime that relates adversely to the practice of nursing and the nurse has not shown sufficient rehabilitation. N.D.C.C. § 43–12.1–14(1). Actions adverse to acceptable standards of nursing practice include behavior that may place a client or other person at risk for harm or incompetence by reason of negligence, patterns of behavior indicating the person is unfit to practice nursing, as well as practice of nursing without sufficient knowledge, skills, or nursing judgment or performing nursing interventions in a manner inconsistent with acceptable nursing standards. N.D. Admin. Code § 54–02–07–01.1(5), (6). Under the criminal code, although a person may not be disqualified to practice in a profession for which a license is required by a state agency solely because of a prior conviction of an offense, such license may be denied if the person "has not been sufficiently rehabilitated, or that the offense has a direct bearing upon a person's ability to serve the public in the specific occupation, trade, or profession." N.D.C.C. § 12.1–33–

02.1(1). In determining whether rehabilitation is sufficient, the agency shall consider:

    a. The nature of the offense and whether it has a direct bearing upon the qualifications, functions, or duties of the specific occupation, trade, or profession.

    b. Information pertaining to the degree of rehabilitation of the convicted person.

    c. The time elapsed since the conviction or release. Completion of a period of five years after final discharge or release from any term of probation, parole or other form of community corrections, or imprisonment, without subsequent conviction shall be deemed prima facie evidence of sufficient rehabilitation.

N.D.C.C. § 12.1–33–02.1(2).

[¶ 33] The ALJ, the district court, and the Board all agreed that Kraft's conviction for simple assault relates adversely to the practice of nursing and she had not demonstrated sufficient rehabilitation. The evidence also showed Kraft was under the influence of alcohol at the time of her arrest. As the ALJ explained, "Although the crime of which Kraft was convicted was simple assault for domestic violence, a class B misdemeanor, it is a crime of violence of willfulness in causing bodily injury to another human being." The district court indicated such crime is diametrically opposed to nursing, one of the healing arts. Regulatory grounds for discipline of nurses include placing not only clients or patients at a risk for harm and improper nursing practices or interventions, but also placing "other person[s]" at risk for harm or patterns of behavior indicating the person is unfit to practice nursing. *See* N.D. Admin. Code § 54–02–07–01.1. Thus, a crime may adversely relate to nursing even if not involving a patient or while performing nursing duties. Furthermore, the executive director of the Board testified as an expert witness that Kraft's conviction for assault adversely relates to the practice of nursing. *See Aggie Invs. GP v. Pub. Serv. Comm'n of N.D.*, 470 N.W.2d 805, 813 (N.D.1991) (stating courts do not substitute their judgment for that of qualified experts of an agency).

[¶ 34] Kraft's conviction occurred less than five years before the Board's decision in this matter. Kraft was under the influence of alcohol during the assault, was diagnosed as an alcoholic, entered treatment for alcoholism, was certified in psychiatric nursing, and yet presented to work under the influence of a chemical substance on January 22, 1999. This is not evidence of rehabilitation, but rather demonstrates a pattern of behavior indicating Kraft is unfit to practice nursing. *See* N.D. Admin. Code § 54–02–07–01.1.

[¶ 35] Because simple assault is adversely related to nursing practices and Kraft has not provided evidence of rehabilitation, we conclude the Board did not err in determining Kraft's conviction relates adversely to the practice of nursing.

E

[¶ 36] Kraft argues the Board's order was not served on Kraft in a timely manner because evidence was received, briefs were filed, and arguments were made by January 31, 2000 at the latest, which placed a deadline of March 31, 2000 for the Board to serve a copy of the final order to the parties. However, the Board did not serve the final order until about April 10, 2000, even though it was dated March 16, 2000. The Board gave no explanation for this delay.

[¶ 37] Under N.D.C.C. § 28–32–13(3), administrative agencies are required to issue their decisions without undue delay:

If a recommended order is issued, the agency must serve a copy of any final order issued and the findings of fact and conclusions of law on which it is based upon all the parties to the proceeding within sixty days after the evidence has been received, briefs filed, and arguments closed, *or as soon thereafter as possible,* in the manner allowed for service under the North Dakota Rules of Civil Procedure. (Emphasis added.)

[¶ 38] Kraft's administrative hearing was conducted on December 17, 1999, the parties concluded their post-hearing briefing on January 31, 2000, and the ALJ issued his recommended order on February 7, 2000. The Board met to review the recommended order on March 16, 2000 and accepted the ALJ's recommendations, with several revisions, on that same date. The Board's formal written order was prepared later, but dated March 16, 2000 to reflect the date of the Board's actual decision. The Board served the final order to Kraft on April 10, 2000, which was within 63 days after the ALJ's recommended order was issued.

[¶ 39] Although the Board technically did not serve the final order within 60 days, Kraft has not shown she was prejudiced by the additional time before receiving this order. We conclude the Board's order was served timely.

## IV

[¶ 40] Kraft also appeals from the district court's denial of her motion for relief, alleging improper ex parte communications by the Board's counsel regarding the final decision and a systemic disregard of unauthorized communications. Kraft contends the minutes of the Board's meeting on March 16, 2000 and affidavits of the Board's counsel and a nurse consultant to the Board provide evidence of improper ex parte communications between the Board's counsel and the Board.

## A

■■■ [¶ 41] Kraft argues the Board's counsel participated in the hearing before the ALJ as an advocate against Kraft's interest and then "selectively determined what the [Board] should consider and gave advice accordingly.". Kraft notes the date of the Board's final order is March 16, 2000, the same date as the Board's meeting; but the hearing transcript is dated July 10, 2000. Thus, Kraft contends the Board made its decision in one day without the benefit of a transcript of the testimony, in a meeting where many other matters were also scheduled, so the Board apparently became familiar with Kraft's case by ex parte communications with the Board's counsel.

■■■ [¶ 42] Generally, an agency is allowed to consult with its outside counsel when reviewing a pending ALJ recommendation, unless those consultations are ex parte. *Lawrence v. N.D. Workers Comp. Bureau,* 2000 ND 60, ¶ 20, 608 N.W.2d 254. Such ex parte communications are addressed under N.D.C.C. § 28–32–12.1:

1. Except as provided in subsections 2 and 4 or unless required for the disposition of ex parte matters specifically authorized by another statute, an agency head or hearing officer in an adjudicative proceeding may not communicate, directly or indirectly, regarding any issue in the proceeding, while the proceeding is pending, ... with any other person allowed to participate in the proceeding, ... without notice and opportunity for all parties to participate in the communication.

. . . .

3. Except as provided in subsection 4 or unless required for the disposition

of ex parte matters specifically authorized by statute, no party to an adjudicative proceeding, ... no person allowed to participate in the proceeding ... may communicate directly or indirectly in connection with any issue in that proceeding, while the proceeding is pending, with any agency head or hearing officer in the proceeding without notice and opportunity for all parties to participate in the communication.

4. In an adjudicative proceeding conducted by a hearing officer other than the agency head, counsel for the administrative agency and the agency head, without notice and opportunity for all parties to participate, may communicate and consult regarding the status of the adjudicative proceeding, discovery, settlement, litigation decisions, and other matters commonly communicated between attorney and client, to permit the agency head to make informed decisions. This subsection does not apply after recommended findings of fact, conclusions of law, and orders have been issued, except counsel for the administrative agency and the agency head may communicate regarding settlement and negotiation after recommended findings of fact, conclusions of law, and orders have been issued.

[¶ 43] We considered an administrative agency's proper use of counsel after counsel appeared at a hearing in a position adversarial to a claimant in *Scott v. N.D. Workers Comp. Bureau*, 1998 ND 221, ¶ 8, 587 N.W.2d 153. In *Scott*, the agency conceded, as a matter of general practice, outside counsel appeared at the hearing on behalf of the agency and later consulted with the agency head who would decide whether to accept or reject the ALJ's recommendations. *Id.* Because outside counsel advised the agency decision-maker to reject the ALJ's decision, and indeed drafted several versions of findings, conclusions, and orders for the agency head to review—all without notice or copies forwarded to the claimant, we concluded the ex parte contacts were improper. *Id.* at ¶¶ 8, 18.

[¶ 44] We have emphasized the strong policy reasons underpinning the prohibition against such ex parte communications, stating these contacts would render adversarial hearings "virtually meaningless." *Elshaug v. N.D. Workers Comp. Bureau*, 2000 ND 42, ¶ 8, 607 N.W.2d 568. "It is difficult to imagine a more serious incursion on fairness than to permit the representative of one of the parties to *privately* communicate his [or her] recommendations to the decision makers." *Id.* (emphasis added). The benchmark is these communications must be ex parte, that is, "without notice and opportunity for all parties to participate in the communication." N.D.C.C. § 28–32–12.1.

[¶ 45] Our review of the evidence indicates the Board's counsel testified he had a "firm belief" he sent Kraft notice of the Board's meeting on March 16, 2000 to discuss the ALJ's recommendations. The Board's counsel stated, "To the best of my[ ] knowledge, information and belief, I had sent a communication to [Kraft's attorney] in advance of the meeting ...," although he was unable to locate a copy of such communication. Kraft offered no evidence to the contrary. The Board meeting was open to the public, and its agenda was publicly posted outside the Board's conference room.

[¶ 46] In the absence of any affidavits by Kraft, testifying as to the lack of notice of the Board meeting discussing the ALJ's recommendations, we conclude the communications between the Board and the

Board's counsel did not violate N.D.C.C. § 28–32–12.1.

### B

[¶ 47] Kraft contends the evidence demonstrates a systemic disregard of the statutory prohibition against improper ex parte communications because the Board's counsel admitted in his affidavit he has been counsel for the Board since 1985 and advises the Board each time it considers recommendations of an ALJ.

[¶ 48] An agency's systemic disregard of the law may warrant reversing the agency decision to ensure the government acts consistently and predictably in accordance with the law. *Greenwood v. Moore*, 545 N.W.2d 790, 793 (N.D.1996). To establish systemic disregard, a party must show at least some persistent pattern of improper agency conduct, that is, evidence of a single improper act is not sufficient. *Id.; see also Scott v. N.D. Workers Comp. Bureau*, 1998 ND 221, ¶ 21, 587 N.W.2d 153 (finding systemic disregard when an agency conceded it routinely allowed improper ex parte communications to occur).

[¶ 49] In his affidavit, the Board's counsel testified:

3. While meeting with the Board of Nursing on March 16, 2000, regarding this matter, and at the Board's request, I reviewed with the Board the factual and legal procedures and the legal alternatives available to the Board in this case. Each time the Board is required to consider Recommended Findings of Fact, Conclusions of Law and Order issued by an administrative law judge in a matter pending before the Board, it is my routine practice to advise the Board accordingly....

[¶ 50] The Board's counsel stated his "regular practice" is to invite opposing counsel to attend Board meetings in which ALJ's recommendations will be discussed. Kraft presents no evidence to the contrary. We conclude there is no evidence of a systemic disregard of the law regarding ex parte communications between the Board decision-maker and the Board's counsel pending final resolution of Kraft's administrative proceeding. The trial court did not abuse its discretion in denying Kraft's motion for relief.

### V

[¶ 51] We affirm in all respects both the district court order denying Kraft's motion for relief and the final order of the Board, suspending Kraft's registered nurse license for one year, ordering Kraft to obtain chemical dependency and psychiatric evaluations, and assessing a $1,000 penalty.

[¶ 52] GERALD W. VANDE WALLE, C.J., and DALE V. SANDSTROM, WILLIAM A. NEUMANN and MARY MUEHLEN MARING, JJ., concur.